Nos. 1-04-1047 & 1-04-1150  Consolidated


| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 12440 |
| | ) | |
| ARTURO REYES, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 12440 |
| | ) | |
| GABRIEL SOLACHE, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

The central issue in these consolidated appeals is whether the confessions of defendants

Arturo Reyes and Gabriel Solache were coerced.  In June 2000, following simultaneous trials before

separate juries, defendants were each found guilty of two counts of first degree murder, two counts

of aggravated kidnaping, and home invasion.  There was no physical evidence linking either defendant

to the crimes. Solache received a sentence of death for the murder convictions, and Reyes was

sentenced to natural life in prison without possibility of parole.  On January 10, 2003, while Solache's

direct appeal was pending before the Illinois Supreme Court, then-Governor George Ryan commuted

Solache's death sentence to natural life imprisonment.  The supreme court then transferred Solache's

Nos. 1-04-1047 & 1-04-1150 Cons.

direct appeal to this court. On August 19, 2003, the appellate court affirmed Solache's convictions and sentences. *People v. Solache*, No. 1-03-1149 (2003) (unpublished order under Supreme Court Rule 23). A few weeks later, on September 30, the appellate court came to the same conclusion regarding Reyes' convictions and sentences. *People v. Reyes*, No. 1-01-2875 (2003) (unpublished order under Supreme Court Rule 23).[1] In December 2003, each defendant filed a petition for postconviction relief pursuant to section 122-1 of the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2002)). In their petitions, defendants claimed, *inter alia*, that their confessions were the result of physical coercion by Detective Reynaldo Guevara of the Chicago police department. In March 2004, within the requisite 90 days, the trial court summarily dismissed each petition as frivolous and patently without merit. Defendants appealed the summary dismissal of their petitions, and their appeals (Reyes, No. 1-04-1047, and Solache, No. 1-04-1150) were consolidated. For the reasons set forth below, we reverse the judgments of the circuit court dismissing defendants' postconviction petitions.

BACKGROUND

Defendants were convicted of the murders of Mariano and Jacinta Soto, who were found stabbed to death in their apartment in Chicago on April 1, 1998. A third defendant, Adriana Mejia, pleaded guilty and was sentenced to natural life imprisonment.

According to testimony at trial, including defendants' inculpatory statements, which were read to the jury by the assistant State's Attorneys who took the statements, the murders took place as

[1]Defendants' petitions for leave to appeal these appellate court decisions to the Illinois Supreme Court were denied on October 6, 2004.

follows. In March 1998, defendants were living in an apartment with Adriana Mejia and her husband, Rosauro. Adriana had been feigning pregnancy, and she needed a baby to claim as her own. On Thursday, March 26, Adriana told Reyes she had found a friend with "a very pretty baby." Early in the morning of Saturday, March 28, Solache drove Reyes to the University of Illinois Hospital and picked up Adriana, who apparently had gone there under the pretext that she was about to give birth. Solache, Reyes and Adriana then drove to the Sotos' residence. While they were en route, Adriana told them that Reyes' assignment was to pick up the baby from the crib, and Solache's assignment was "to take care of Mr. Soto." Adriana said she would "take care of Mrs. Soto." When they arrived at the Sotos' apartment, Adriana knocked and, when Jacinta came to the door, Adriana asked Jacinta to let her in because she had no place else to go. Adriana, Reyes and Solache then entered the apartment. Reyes stabbed Jacinta and then ran to the bedroom and picked up the Sotos' two-month-old daughter, Maria. Reyes also took Santiago, the couple's three-year-old son, who was lying next to his father in the bed. Meanwhile, Solache picked up a knife from the kitchen table and ran to the bedroom, where he saw a man (Mariano Soto) lying face up, asleep on the bed. Solache stabbed the man in the stomach, then ran out of the bedroom and threw the knife down just outside the bedroom door. While Reyes was running out of the apartment with the children, he looked back and saw Adriana "on top of" Jacinta "stabbing her in the back like an animal." Reyes took the children to the car. Adriana and Solache then emerged from the apartment, and the three of them drove away. They dropped Adriana and the two children off at the hospital, and Solache and Reyes went back to their apartment and went to bed.

3

Later in the morning of March 28, Rosauro, believing that Adriana had given birth, came to the hospital to pick her up. When Rosauro arrived at the hospital, he saw that she had not only a baby but a three-year-old boy as well. Adriana explained the presence of the boy by stating that another woman, Norma Salazar, had asked Adriana to care for the boy while she, Salazar, was giving birth at the hospital. Rosauro and Adriana then returned to their apartment with the two children.

On April 1, 1998, police found the bodies of the Sotos in their apartment. Officer David Valentin testified that, when he and his partner entered the apartment, they saw a "male Hispanic" lying face up by the doorway with multiple stab wounds. In the bedroom, they saw a blanket in the middle of the room. Under the blanket was a "female Hispanic" with multiple stab wounds. The police also discovered that the Sotos' two children were missing. A police bulletin describing the children indicated that the baby had a wine-stain birthmark on her neck.

Late in the evening of the next day, April 2, Guadalupe Mejia, the sister-in-law of Adriana and Rosauro, saw a picture of the Sotos' three-year-old son on television, along with a news report about the murders. Guadalupe, who lived with her husband, Jorge, in the same apartment building as Adriana and Rosauro, recognized the boy as the same one that Adriana had brought home from the hospital on March 28. Fearing that the woman (Norma Salazar) who had given the boy to Adriana had murdered the child's parents, Guadalupe told Adriana what she had seen and urged her to call the police. Rosauro arrived home from work at 1:30 a.m. (April 3) and was told that the boy had been reported missing and his parents had been murdered. Rosauro then took the boy to the 8th district police station. Reyes and Solache went with him.

Officers at the 8th district station verified that the boy was Santiago Soto. Rosauro, Solache and Reyes were taken to the Area 5 station for further questioning. Detective William Kernan testified that he called the hospital and learned that neither Norma Salazar nor Adriana Mejia had ever been a patient there. Detectives were then sent to Adriana Mejia's apartment. When they saw the baby, they noticed that it was not a newborn (the child's umbilical cord had healed). They identified the baby as Maria Soto by the wine-stain birthmark on her neck. Adriana was then arrested. When authorities at Area 5 (where Rosauro, Solache and Reyes were being questioned) were notified of what occurred at the Mejia apartment, Rosauro, Solache and Reyes were also arrested.

Rosauro Mejia was held at Area 5 for two to three days and then released. He was never charged. In addition, Norma Salazar was never charged in this case. Adriana Mejia, Reyes and Solache were each charged with first degree murder, aggravated kidnaping and home invasion. As previously noted, Adriana subsequently pleaded guilty and was sentenced to life imprisonment.

Prior to trial, defendants moved to suppress their statements on the ground, among others, that the statements had been coerced. In his motion, Solache alleged that he was a Mexican national and did not speak English and that he had difficulty understanding the Puerto Rican detective (Guevara) who interviewed him. Solache also alleged that the detective slapped him and chipped his tooth. Similar to Solache, Reyes alleged in his motion that he was a Mexican citizen and could not read, write or speak English. According to Reyes, his statements were obtained "as a result of physical, psychological and mental coercion." Specifically, Reyes alleged that a police officer (Guevara) interviewed him repeatedly and, on several occasions, struck him. In one instance, the officer allegedly asked Reyes why he had committed the crimes, and when Reyes denied any

participation in the offenses, the officer allegedly hit him and told him he was lying. In another instance, Reyes allegedly was told that if he persisted in his denials and failed to say anything against Adriana or Solache, he would be allowing them to put the blame entirely on him, and he would get the electric chair.

The trial court conducted a series of hearings on the motions to suppress. Numerous witnesses testified, including Reyes, Solache and Guevara. According to the testimony of Guevara and other witnesses, Adriana, Reyes and Solache were held at Area 5 for at least two days and were questioned separately. Initially, all three denied any involvement in the murders. However, late in the evening of April 3, the same day the three were arrested, Adriana implicated Reyes in the crimes. This occurred at about 10:30 p.m. when Guevara, who was fluent in Spanish, confronted Adriana with her shoes and a baby's coat, both of which had blood on them. Adriana then stated that Reyes was the one who had kidnaped the children and killed their parents. At that point, she did not indicate that anyone else was involved. At 11:30 p.m., Guevara spoke to Reyes and told him that Adriana had implicated him. Reyes denied any involvement in the crimes. Shortly thereafter, at 12:15 a.m. on April 4, Guevara spoke to Solache, and he also denied any involvement.

Guevara further testified that at 3 p.m. on April 4, he again spoke to Reyes and confronted him with Adriana's accusation. At that point, according to Guevara, Reyes said: "Well, now I'm going to tell you who was really there and what everybody did." Reyes told Guevara that he and Adriana and Solache all were present at the scene of the crimes and that Solache was the one who went into the bedroom and stabbed the husband. At 8 p.m. on April 4, Guevara again spoke with Adriana and confronted her with Reyes' statement that she and Solache also were involved in the

6

murders. Adriana then conceded that Solache was involved as well. Shortly thereafter, at 9 p.m., Guevara spoke with Solache and told him that both Adriana and Reyes had implicated him in the murders. According to Guevara, Solache said: "Okay. I'll tell you. I'll tell you what happened. I was there and I'll tell you what happened."

In the early morning hours of the next day, April 5, Adriana, Reyes and Solache each gave a written inculpatory statement. Reyes' statement was given to Assistant State's Attorney (ASA) Thomas O'Malley, with Officer Daniel Trevino interpreting. O'Malley testified that at no time in his presence did any police officer hit or strike Reyes or tell him he was lying. Photographs were taken of Reyes at the time of his statement. Solache's statement was taken by ASA Heather Brualdi, with Guevara interpreting. According to Brualdi, when she finished writing the statement in English, she gave it to Guevara, and he translated it to Solache. Brualdi testified further that she saw no marks on Solache's face. She observed that he had a chipped tooth and an "old scar" on his skull. Photographs also were taken of Solache. Adriana's statement was given to ASA David Navarro, who spoke Spanish.

At about 8:30 a.m. the same day, April 5, Officer Saul Basurto processed Solache and Reyes when they were brought to the lockup. Basurto testified that when he processed Reyes, he observed no obvious evidence of pain or injury. According to Basurto, who spoke Spanish, Reyes did not complain of being hit by a police officer while in custody, nor did he complain that he was screamed at or interrogated in a loud fashion. Basurto gave essentially the same report regarding Solache. According to Basurto, Solache did not complain to him of any mistreatment or maltreatment. Photographs were taken of both Reyes and Solache at the time that they were processed. The next

7

day, April 6, John Musa, a medical intake officer at the Cook County jail, processed Solache and Reyes. Musa, who spoke Spanish, testified that he observed no injuries or bruises on Reyes and that Reyes made no complaints of any injuries. With regard to Solache, Musa testified that he observed a scar on Solache's head which was "an old injury," but he saw no other injuries. Musa asked Solache if he had any recent head injuries, and Solache answered in the negative.

In his testimony, Reyes stated that he could neither read nor write English and that when he signed the written statement, which was in English, he had no idea what it said. Reyes denied telling Guevara that he was involved in the murders of the Sotos. Instead, Reyes told Guevara that he "wasn't involved" and that he "didn't know what had happened." Reyes also testified that Guevara physically abused him while Reyes was in custody. According to Reyes, when Guevara first interviewed him, he took a cap off Reyes' head and slapped him "very hard" in the face. Guevara then asked Reyes why he had "do[ne] it." Reyes told Guevara that he did not know what he was talking about. Reyes testified further that on another occasion, Guevara told Reyes that he was not helping himself and was "letting other people blame [him]," and that if he did not say something, "most likely [he would] get the electric chair." Subsequently, Guevara interviewed Reyes again and asked him a series of questions, in a loud voice, regarding whether Reyes had murdered Jacinta and Mariano Soto and whether he had kidnaped their children. According to Reyes, every time he answered "no," Guevara would tell him to stop lying and slap him in the face with an open hand. Reyes also testified that Guevara never advised him of his *Miranda* rights.

Solache's testimony was similar to that of Reyes. Solache stated that he could neither read nor speak English and that he wrote his name on his statement, which was in English, because

8

Guevara told him to do it. Solache denied that Guevara read the statement to him. Solache also testified, as did Reyes, that Guevara physically abused him. According to Solache, when Guevara first spoke to him, Guevara told Solache what he had been accused of, and Solache told Guevara that he "wasn't involved." Solache testified that Guevara then started "beating" him. Solache explained that Guevara hit him "many times" with an open hand on the left side of his face. Solache testified that he was handcuffed to a ring in the wall on his right side, and this was the reason he was hit on the left side of his face. Solache testified further that Guevara left the interview room and returned with Adriana, who stated that Solache had "helped her" in committing the murders. Solache told Adriana that this "wasn't true," and he told Guevara that he "hadn't done anything." According to Solache, Guevara then hit him with an open hand in front of Adriana. Guevara and Adriana then left the room, and Guevara returned and allegedly began beating Solache in the stomach. Solache testified that he then "pled guilty because [he] couldn't *** stand the beating anymore."

Solache also testified that, prior to April 3, 1998, when he was arrested in this case, he could hear in his left ear, but now he could hear in that ear only with a hearing aid. Without the hearing aid, Solache maintained, he could hear "nothing" with his left ear. On cross-examination, Solache acknowledged that the scar on his head was from an auto accident in 1997. Solache denied that there was any injury to his ear in the accident.

Adriana testified in support of defendants' claims of physical abuse. According to Adriana, Guevara physically abused her while she was being questioned in his office at Area 5. Adriana stated that Guevara told her he was tired of her lies, and he pulled her hair three times and hit her "very

9

hard" on her back. Adriana also testified, as had Solache, that Guevara took her to the room where Solache was being held, and he slapped Solache in front of her.

The defense called Maria Rivera to testify in support of defendants' claims that their statements were coerced. Rivera testified that in August 1996 she spoke to Guevara about a shooting that occurred near her house in which two young men were killed. Rivera testified further that she did not see the individuals who did the shooting. However, on October 18, 1996, she identified a person in a lineup as one of the individuals who had committed the shooting. According to Rivera, Guevara told her to identify this person. Rivera also testified that she subsequently told the assistant State's Attorney that Guevara had told her to identify the person but that she had not seen that person commit the shooting.

In answer to a question from the trial court, defense counsel explained the relevance of Rivera's testimony to defendants' claims that their statements were coerced. According to counsel, Rivera's testimony showed that Guevara used the same technique in the past to coerce a witness in another murder case to make a false identification. Counsel added that, after Rivera told the state's attorney what had happened, the State nol-prossed the murder charges against the defendants in that case.

On cross-examination, Rivera conceded that Guevara did not hit her or give her money to persuade her to make the identification. However, she insisted that Guevara "forced" her to do it. She stated: "I know a lot of things about that detective."

The trial court denied defendants' motions to suppress based on "so-called physical abuse." The court stated:

"The police in my opinion *** based on the *** credible evidence did not do anything

at all to mistreat either Arturo DeLeon [Reyes] or Gabriel Solache. Everybody [who] came

into contact with them, the booking officers, the jailers, whoever came into contact with those

two men indicated they never expressed anything about being mistreated by the police, about

any injuries supposedly obtained as a result of police misconduct regarding them."

According to the trial court, the evidence clearly established that "neither m[a]n [was] abused in any

fashion by Detective Guevara." The court noted that Reyes and Solache gave inculpatory statements

only after "they were confronted with respect to the statements of other defendants."

The testimony at trial was essentially the same as the testimony at the suppression hearings,

with a few notable additions. Barbara Wilson, a biochemist with the Illinois State Police, testified that

she performed DNA analysis in this case on a number of items with bloodstains, including knives,

shoes and other articles of clothing. Wilson found that DNA samples taken from bloodstains on

Adriana's shoes and trousers matched the DNA profile of Mariano Soto, one of the murder victims.

Wilson found, in addition, that DNA from a bloodstain on a knife taken from the Sotos' apartment

matched Adriana's DNA profile. However, Wilson's tests uncovered no DNA matching the profile

of either Reyes or Solache.

As previously indicated, the written inculpatory statements given by Reyes and Solache were

read to their respective juries. Solache's statement was read to the jury by the ASA who took the

statement, Heather Brualdi. Reyes' statement was read to the jury by the ASA who took his

statement, Thomas O'Malley.

11

Adriana's husband, Rosauro[2], who was never charged in this case, testified in support of defendants' claims of physical abuse. Rosauro stated that Guevara questioned him while he, Rosauro, was being held at Area 5 along with Reyes and Solache shortly after their arrest. According to Rosauro, Guevara asked him how much he had paid for the little girl. When Rosauro answered that he did not pay anything for a girl, Guevara hit him. Rosauro stated: "He kept hitting me because he did not believe me." Rosauro testified that he was being held down by another person while Guevara hit him two or three times.

In their testimony at trial, defendants repeated their allegations of abuse by Guevara. Each defendant also expressly denied any involvement in the murders. For his part, Guevara denied hitting, striking, or slapping either defendant. According to Guevara, he saw no injuries on Solache's or Reyes' face, and neither of them ever complained to Guevara that he had been struck by a police officer.

In his instructions to the jury, the trial court included the following instruction regarding defendants' statements:

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

---

[2]On June 19, 2000, the date of Rosauro's testimony, he stated that he was no longer married to Adriana.

On June 20, 2000, each defendant was found guilty by his respective jury of two counts of first degree murder, two counts of aggravated kidnaping, and home invasion. In his motion for a new trial, Solache alleged, *inter alia*, that the trial court erred in denying his motion to suppress statements "based on the conduct of Detective Reynaldo Guevara." Reyes filed a similar posttrial motion alleging, *inter alia*, that the trial court erred in denying his motion to suppress statements based on coercion. Included as an attachment to each motion was a copy of the same article from The Chicago Reporter (R. Anderson, *Eyewitnesses Confuse, Convict in Humboldt Park Murder Cases*, The Chicago Reporter, June 2000, at 3). The article examined what it termed "questionable police practices" at Area 5 regarding several murder cases. Guevara was involved in each of these cases.

In August 2000, the trial court denied defendants' motions for a new trial. With regard to defendants' claims that their statements were coerced, the court concluded that "[t]here was no credible evidence whatever that Solach[e] and Reyes were injured in police custody at all." The court noted defendants' testimony that their statements were coerced, but stated: "I don't believe any of that testimony. I did not believe it then [during the pretrial suppression hearings] and nothing has happened to change my mind." The court added that defendants' inculpatory statements were given only after they were confronted with statements implicating them in the kidnaping and double murder.

Defendants waived a jury trial for sentencing. Following first- and second-stage capital sentencing hearings, the trial court found, with regard to Reyes, that there were sufficient mitigating factors to preclude the sentence of death. With regard to Solache, the court found no such mitigating factors. The court sentenced Reyes to life imprisonment without possibility of parole for the murder

13

convictions. Reyes was also sentenced to 30 years' imprisonment for his kidnaping and home invasion convictions, to run concurrently with the life sentences. Solache received death sentences for the murder convictions, and the same 30-year sentences as Reyes for the other convictions.

Under Supreme Court Rule 603 (134 Ill. 2d R. 603), because Solache was sentenced to death, his appeal lay directly to the Illinois Supreme Court. As previously noted, on January 10, 2003, while Solache's appeal was pending, then-Governor George Ryan commuted Solache's death sentence to natural life imprisonment. Because Solache was no longer sentenced to death, the supreme court transferred his direct appeal to the appellate court.

On August 10, 2003, the appellate court affirmed Solache's convictions and sentences. *People v. Solache*, No. 1-03-1149 (unpublished order under Supreme Court Rule 23). A few weeks later, on September 30, the appellate court reached the same conclusion with regard to Reyes' convictions and sentences. *People v. Reyes*, No. 1-01-2875 (unpublished order under Supreme Court Rule 23). The court expressly rejected defendants' claims that their inculpatory statements were coerced. In Reyes' case, the court stated:

"Ultimately, the instant case hinges almost entirely on credibility. As detailed above, this determination was for the trial court to make, which it did, against defendant. Specifically, the trial court did not find defendant's claim of abuse/beatings credible. *** It is not for this court to second guess the trial court's decision, particularly given that it was specifically based on the demeanor of the witnesses during their testimony. Moreover, as noted above, the trial court was not required to give more credence to defendant's claim over

14

that of Detective Guevara, who denied striking defendant." *People v. Reyes*, slip op. at 27-28.

In Solache's case, the court employed similar language with regard to this issue.

On December 17, 2003, Reyes filed a *pro se* petition for postconviction relief asserting, among other claims, that his trial counsel was ineffective for failing to investigate the abuse inflicted on Reyes by Guevara. According to Reyes, this physical coercion rendered his inculpatory statement involuntary. Reyes also claimed that he was the victim of prosecutorial misconduct, that he was subjected to an illegal search and seizure, and that he was not proven guilty beyond a reasonable doubt.

The next day, December 18, Solache filed a petition for postconviction relief. Solache's petition, which contained 14 claims, was filed with the assistance of counsel. Chief among Solache's claims was the allegation, similar to Reyes', that Solache's confession was the product of a beating by Guevara. In support of this claim, Solache presented what he termed "substantial new evidence that Detective Guevara has systematically used improper techniques, including excessive physical force, to coerce false statements from suspects and civilians." This "new evidence" consisted of 23 allegations that, in Solache's view, "establish a clear pattern and practice of misconduct and abuse by Detective Reynaldo Guevara." Four of these allegations were not new. They included the complaints made against Guevara in this case by Maria Rivera, Adriana, and Reyes at the suppression hearings, and by Rosauro Mejia at trial. An additional item of allegedly new evidence attached to Solache's petition was an FBI report regarding an interview with Mohamed Omar, who was

15

convicted in April 2001 on racketeering and drug conspiracy charges. In this interview, which took place on June 20 and 21, 2001, at the United State's Attorney's office in Chicago, Omar alleged that Guevara had a reputation for taking bribes to fix cases.

Solache's petition also claimed, in the alternative, that if it were found that the allegedly new evidence was not newly discovered, then his trial counsel had a duty to investigate and present this evidence, and her failure to do so constituted ineffective assistance of counsel. The remainder of the claims in Solache's petition consisted of additional allegations of ineffective assistance of counsel and allegations of *Brady* violations for failure to disclose materially favorable evidence.

On March 2, 2004, the trial court summarily dismissed Reyes' postconviction petition as frivolous and patently without merit. Ten days later, on March 12, the trial court reached the same conclusion regarding Solache's petition. Each defendant filed a notice of appeal, and their appeals were consolidated.

DISCUSSION

The Post-Conviction Hearing Act (Act) provides a remedy for defendants who have suffered a substantial violation of their constitutional rights at trial. A proceeding under the Act is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment. *People v. Evans*, 186 Ill. 2d 83, 89 (1999). Consequently, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are forfeited. *People v. Rogers*, 197 Ill. 2d 216, 221 (2001). Under the Act, a postconviction proceeding not involving the death penalty contains three stages. *People v. Edwards*, 197 Ill. 2d 239, 244

16

(2001). At the first stage, the defendant files a petition and the circuit court determines whether it is frivolous or patently without merit. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At this stage, the Act does not permit any motions or responsive pleadings from the State. *Gaultney*, 174 Ill. 2d at 418. If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. *Edwards*, 197 Ill. 2d at 244; 725 ILCS 5/122-2.1(a)(2) (West 2002). A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim. *Edwards*, 197 Ill. 2d at 244; *Gaultney*, 174 Ill. 2d at 418. The "gist" standard is a low threshold, and a defendant need only present a limited amount of detail in the petition. *Edwards*, 197 Ill. 2d at 244. The claim need not be set forth in its entirety. Further, the petition need not include legal arguments or citation to legal authority. *Edwards*, 197 Ill. 2d at 244; *Gaultney*, 174 Ill. 2d at 418. The circuit court may summarily dismiss a postconviction petition if the defendant's allegations are contradicted by the record from the original trial proceedings. *Rogers*, 197 Ill. 2d at 222.

If the petition is not dismissed as frivolous or patently without merit, it advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2002)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2002)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. "If no such showing is made, the petition is dismissed. If, however, a substantial showing of a

constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing."  *Edwards*, 197 Ill. 2d at 246.

In the case at bar, defendants' petitions were dismissed as frivolous and patently without merit.  Because this was a first-stage dismissal, the question before us is not whether defendants' petitions made a substantial showing of a constitutional violation.  "[T]hat is a second-stage inquiry." *Edwards*, 197 Ill. 2d at 246.  Rather, the question we must address is whether defendants' petitions were frivolous or patently without merit, *i.e.*, whether they presented the gist of a constitutional claim.  Our review of the circuit court's dismissals of defendants' postconviction petitions is *de novo*. *Edwards*, 197 Ill. 2d at 247; *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

Solache argues before this court, as he did in his postconviction petition, that his confession was coerced and that the "substantial new evidence" he presented in his petition demonstrated that "Detective Guevara has systematically used improper techniques, including excessive physical force, to coerce false statements from suspects and witnesses."  In Solache's view, this evidence "would have had a dramatic effect on the credibility of those who testified at the suppression hearing." Solache argues that he has met his burden of alleging the gist of a constitutional claim, and his petition should have been advanced to the second stage.

In his brief to this court, Reyes makes essentially the same argument.  He points to the allegedly newly discovered evidence included in Solache's petition, and argues that this evidence establishes a pattern of abuse and misconduct by Guevara "beginning in 1983 and continuing through the time of Reyes' arrest."  According to Reyes, this evidence lends support to a similar claim in his

*pro se* petition that other claims of abuse existed (Adriana and Solache) to substantiate his claims of abuse by Guevara.

However, in his *pro se* petition, Reyes did not raise newly discovered evidence. His claim in his petition was that his trial counsel was ineffective for failing to investigate "the abuse inflicted upon [him] at the hands of Det. Reynaldo Guevara." Reyes stated:

> "[Counsel] should have asked and filed a complaint asking that Det. Reynaldo Guevara be investigated because the allegations that I put forth about being Slapped by Det. Reynaldo Guevara are true and factual. Not only did I bring this up but Gabriel Solache and Adriana Mejia also said they were abused in the same fashion and testified to this as well. *** My Attorney *** should have fought this issue harder. *** This was a really big issue in My Defense and had this been investigated thoroughly it would have shown this Statement [Reyes' confession] was involuntary and was given because of physical coercion by Det. Reynaldo Guevara."

The State argues that because Reyes' claim in his petition was for ineffective assistance of counsel, rather than newly discovered evidence, he has waived his right to raise the newly-discovered-evidence claim on appeal. The State contends that Reyes has simply adopted Solache's claims as his own, even though "none of it was before the trial judge when he ruled on Reyes' petition," and this issue (newly discovered allegations of abuse by Guevara) is being improperly raised for the first time on appeal. We disagree with the State.

At the first stage of the proceedings, a post-conviction petition need not set forth a claim in its entirety, and need only present a limited amount of detail. *Edwards*, 197 Ill. 2d at 244. Moreover, the allegations in the petition are to be liberally construed. *Edwards*, 197 Ill. 2d at 244. These principles apply with special force where the petition is *pro se* and the petitioner is likely a person of limited education. *People v. Dredge*, 148 Ill. App. 3d 911, 913 (1986). In the case at bar, Reyes' petition, as did Solache's, alleged physical abuse by Guevara. Reyes mentioned that Solache and Adriana had complained of similar abuse, and Reyes further alleged that if the issue of physical abuse had been thoroughly investigated, such an investigation would have shown that Reyes' statement was, in fact, the result of physical coercion by Guevara. Interpreting Reyes' allegations liberally, we conclude that Reyes' petition sufficiently included a claim of newly discovered evidence, and Reyes therefore did not forfeit his right to raise this issue on appeal.

In reaching this conclusion, we reject the State's argument that none of the claims of newly discovered evidence that were included in Solache's petition were before the trial judge when he ruled on Reyes' petition. As previously indicated, Reyes' *pro se* petition was filed on December 17, 2003, and Solache's petition was filed one day later, on December 18. The trial judge ruled on Reyes' petition on March 2, 2004, and on Solache's petition 10 days later, on March 12. Solache's and Reyes' trials were before separate juries, but the trials were conducted simultaneously before the same trial judge. The two cases were intertwined. In our view, it would elevate form over substance to conclude, as the State contends, that Solache's claims of newly discovered evidence were not before the judge when he ruled on Reyes' petition.

Nos. 1-04-1047 & 1-04-1150 Cons.

We turn next to the issue of whether defendants' claims of coercion by Guevara are barred by the doctrine of *res judicata*. In the case at bar, the issue of the voluntariness of defendants' confessions was litigated and decided on direct appeal. Issues that were decided on direct appeal are barred by *res judicata*. *Rogers*, 197 Ill. 2d at 221; *Evans*, 186 Ill. 2d at 89. However, our supreme court has recognized that, "in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence." *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). In order for new evidence to be sufficient to warrant a new trial, (1) it must be material and not merely cumulative, (2) it must be of such conclusive character that it will probably change the result on retrial, and (3) the evidence must not have been discovered or discoverable through the defense's due diligence prior to the original trial. *Patterson*, 192 Ill. 2d at 139.

The question before us is whether the allegedly new evidence at issue qualifies as "substantial new evidence" and therefore warrants relaxation of the doctrine of *res judicata*. As previously noted, 4 of the 23 allegations included in Solache's petition are not new. At least one other allegation makes no mention of Guevara, and another is an allegation of physical abuse against Guevara's partner rather than Guevara. Of the remaining allegations, at least six allege the use of physical force against suspects and witnesses, and six others involve the improper influencing of witnesses to identify suspects.

An example of the physical force allegations is that of Armando Serrano. Solache's petition included as an exhibit a copy of Serrano's petition for postconviction relief, dated August 6, 1999. In this petition, which indicated Serrano was sentenced in March 1995 for murder and armed robbery,

21

Serrano alleged that Guevara and his partner took Serrano from his home on June 11, 1993, and transported him to the Area 5 police station for interrogation. During this interrogation, Guevara allegedly hit Serrano in the face, called him a liar, and struck Serrano on his body "in hopes of obtaining a confession." Another exhibit included in Solache's petition is a copy of the opinion in *People v. Pena*, 174 Ill. App. 3d 281 (1988). Defendant Daniel Pena was convicted of murder, conspiracy to commit murder, and armed violence. On appeal, Pena argued, among other things, that his confession was involuntary. According to Pena, during his interrogation at Area 5 in January 1986, Guevara "repeatedly struck defendant in the face, ribs and on the legs from the groin to his knees with a flashlight." *Pena*, 174 Ill. App. 3d at 282. Guevara testified that Pena was not abused but there was a struggle when he was arrested. The appellate court concluded that Pena's confession was voluntary and affirmed his convictions and sentence. An additional exhibit attached to Solache's petition was a summary report of a complaint filed by Melvin Warren with the Chicago Police Department's Office of Professional Standards (OPS). Warren complained that, on April 16, 1986, Guevara (1) hit Warren with his fist on the right side of his face, (2) pushed Warren down in Warren's car, grabbed him around the neck, and choked him, (3) verbally abused him by calling him a "nigger dog" several times, and (4) verbally threatened Warren by stating that he (Guevara) would tear Warren's head off. According to the summary report (page 5 of which is missing from the record), the complaint arose from a traffic incident that took place while Guevara was off duty. Warren apparently cut Guevara off while Guevara was driving. Guevara then motioned for Warren to pull over. Warren alleged that, when he (Warren) emerged from his car, Guevara called him a "nigger

22

dog" and threatened to tear his head off. Warren further alleged that when he (Warren) walked back to his car, Guevara hit him on the right side of his face with his fist, pushed Warren down in his car, grabbed him around the neck, and choked him. Warren stated that he then grabbed Guevara's wrist and bit Guevara until Guevara released Warren's neck. Two eyewitnesses confirmed that Guevara initiated this beating. The OPS report cited the arrest report in this case as indicating that Warren was arrested for simple battery, resisting arrest, and negligent driving. The OPS conducted an investigation of Warren's complaint and sustained Warren's allegations that Guevara hit Warren in the face with his fist; pushed Warren in his car, grabbed him by the neck, and choked him; and verbally abused Warren by calling him a "nigger."

An example of the improper-influencing allegations is that of David Velasquez. Solache's petition included as an exhibit Velasquez's testimony recanting an identification he made on May 10, 1991, in the murder case of Daniel Rodriguez. According to Velasquez, he falsely identified the accused after being questioned at Area 5 by Guevara and his partner, Detective Halvorsen. Velasquez testified that he was chained to a wall at Area 5, he was hit with a flashlight, and that Guevara told him what to say and threatened to "pin" the murder on him if he did not sign the false identification. Another exhibit attached to Solache's petition was the testimony of Luis Figueroa, who recanted his previous identification of Angel Diaz in a murder case. Figueroa, who was incarcerated at the time of his recantation testimony, stated that he viewed a lineup on February 6, 1995, and falsely identified Diaz as the shooter after Officer "Ray Cavera" "told [Figueroa] to pick him out." Figueroa further testified that "Cavera" told him Diaz "was the one that did it and he wants

to take him down \*\*\* when I got there he was asking me \*\*\* what did you see, you know, I told him I could not see anything, and he told me [']I found out who did it and his name is Angel Diaz.[']" Also attached as an exhibit to Solache's petition was the testimony of Jose Melendez, who stated that on May 30, 1995, he falsely identified the accused in a murder case. According to Melendez, he was at Area 5 when Guevara showed him a photo array consisting of six photographs. Melendez testified that he indicated he had not seen the shooter, but Guevara separated out one of the photos from the rest and told Melendez he had reason to believe this was the killer. Melendez testified: "I think that day I was mad, I was angry. My friend got shot, and [Guevara] told me to point [the accused] out because he had reason to believe this was the guy."

Before applying the *Patterson* test to determine if defendants' allegedly new evidence is sufficient to warrant relaxation of *res judicata*, we note the difference in procedural posture between *Patterson* and the case at bar. *Patterson* was a capital case, and such cases are handled differently under the Act than are noncapital cases. There is no provision authorizing the circuit court to dismiss a capital defendant's petition if it is frivolous or patently without merit. *People v. Thomas*, 195 Ill. 2d 37, 40 (2001). Instead, where the petitioner is under sentence of death, the circuit court must first determine whether the petitioner, if indigent, wants to be represented by counsel. After the petitioner makes that choice, the matter is docketed for further proceedings. At that point, the State may either answer the petition or move to dismiss it. *Thomas*, 195 Ill. 2d at 40. Accordingly, there is no "first stage" proceeding for a capital postconviction petition. Instead, such a petition moves automatically to the second stage, where counsel is appointed to represent the defendant, if necessary, and the State

24

is allowed to file responsive pleadings (*Edwards*, 197 Ill. 2d at 245-46). In *Patterson*, pursuant to this procedure, the defendant's petition was dismissed only *after* the State had moved to dismiss it. Because this dismissal came at the second stage, the defendant's burden was greater than in the first stage, where he is required only to present the gist of a constitutional claim. At the second stage, as noted, the question is whether the petition and any accompanying documentation make a substantial showing of a constitutional violation.

This greater, second-stage burden is apparent in the language used in *Patterson* to introduce the three-tier test for determining whether allegedly new evidence constitutes "substantial new evidence" such that *res judicata* may be relaxed. The court states: "For new evidence to be sufficient to warrant *a new trial* ***." (Emphasis added.) *Patterson*, 192 Ill. 2d at 139. However, at the first stage, as in the case at bar, the petitioner is not seeking a new trial. Rather, he is seeking only to advance to the second stage of the proceeding, where he may have the assistance of counsel, if necessary, and the State may file responsive pleadings. Because the dismissal of the petition in the instant case came in the first stage rather than the second stage, the burden on defendants to establish that their allegedly new evidence was "substantial new evidence" is necessarily lighter than was the burden on the petitioner in *Patterson*. In order to set forth the gist of a constitutional claim, which our supreme court has described as " 'a low threshold' " (*Edwards*, 197 Ill. 2d at 244, quoting *Gaultney*, 174 Ill. 2d at 418), a first-stage petition need only present a limited amount of detail and need not include legal arguments or citations to legal authority (*Edwards*, 197 Ill. 2d at 244, quoting *Gaultney*, 174 Ill. 2d at 418). Moreover, in keeping with this lighter burden, the trial court is not to

consider a first-stage petition on the merits. Rather, the court is to determine "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *People v. Smith*, 326 Ill. App. 3d 831, 839 (2001). The first stage of postconviction review presents merely a pleading question. "Unless positively rebutted by the record, all well-pled facts are taken as true at this stage." *Smith*, 326 Ill. App. 3d at 839.

With this lighter, first-stage burden in mind, we turn to the question of whether defendants' "new" evidence is sufficient to relax *res judicata*. The test articulated in *Patterson* focuses on three areas: the materiality of the evidence, the degree to which it is conclusive in character, and its newness. With regard to materiality, defendants argue that their new evidence is relevant and material because it establishes a course of conduct and pattern of abuse on the part of Guevara which would impeach Guevara's credibility and corroborate defendants' claims of abuse.

While evidence of other bad acts is not admissible to prove a propensity to commit those acts, such evidence is admissible for any other relevant purpose. *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997). For example, evidence of other acts of brutality could be used to prove a course of conduct on the part of the officers involved and could be used to impeach these officers' credibility. *Cannon*, 293 Ill. App. 3d at 640. Prior allegations of brutality have been found admissible where they involved the same officer or officers as in the defendant's case, where they involved similar methods of abuse, and where they occurred at or near the time of the defendant's allegations. *Patterson*, 192 Ill. 2d at 115. With regard to proximity in time, *Patterson* added:

26

"Even incidents that are remote in time can become relevant, however, if the party presenting the evidence can present evidence of other incidents that occurred in the interim. Thus, a single incident years removed has little relevance. However, a series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture." *Patterson*, 192 Ill. 2d at 140.

In the case at bar, each of these three factors is present. Guevara, the officer who defendants allege abused them, is the same officer identified in the allegations set forth above (as well as others not listed here but included in Solache's petition). In addition, the methods of abuse are similar. Solache and Reyes both testified that Guevara hit them repeatedly in the face, and Reyes claimed that Guevara called him a liar. Similarly, Serrano, Pena and Warren all alleged that Guevara hit them in the face, and Serrano claimed that Guevara called him a liar. With regard to the time when the incidents alleged in Solache's petition occurred, those involving physical abuse took place in 1983, 1986 and 1993. While none of these alleged incidents occurred at or near the time of defendants' allegations of abuse, they nevertheless constitute "a series of events spanning several years" (*Patterson*, 192 Ill. 2d at 140) and therefore may be relevant to establishing a claim of a pattern and practice of abuse.

The second requirement in the *Patterson* test is that the evidence be of such conclusive character that it will probably change the result on retrial. The "new" evidence cited in Solache's petition appears to meet this requirement. If even a fraction of the allegations included in this evidence had been presented prior to trial, it appears likely that Guevara's credibility would have been

damaged and defendants' confessions would have been suppressed. Without these confessions, the State's case against defendants would have been severely weakened. No DNA matching the profile of either defendant was found at the scene of the crimes. In addition, no other physical evidence was uncovered linking defendants to the offenses.

According to the third step in the *Patterson* test, the evidence must not have been discovered or discoverable through the defense's due diligence prior to the original trial. Defendants concede that most of the allegations included in their "new" evidence existed at the time of trial. However, they contend that this evidence was not discoverable through due diligence. Defendants note that, prior to trial, Solache's counsel filed subpoenas with the Chicago Police Department's Office of Professional Standards and Office of Internal Affairs seeking copies of all complaints, investigations and findings regarding Guevara. Seven files ultimately were turned over to the circuit court. After reviewing them *in camera*, the trial judge determined that the files were not relevant, and counsel for Solache was not able to view their contents. Defendants point to this incident as evidence that, even with reasonable due diligence efforts, counsel was unable to obtain these files prior to trial.

The trial court rejected the argument that defendants' evidence could not have been discovered earlier. In its order dismissing Solache's petition, the court stated: "Once petitioner alleged to his attorneys that he was beaten, it seems reasonable to expect that counsel would conduct an investigation to determine if the police officers involved had any other complaints made against them." We disagree with the trial court. As noted, counsel for Solache did conduct an investigation regarding other complaints against Guevara, but her efforts were unsuccessful. In our view, the

28

various allegations against Guevara could have been discovered prior to trial only if defense counsel had interviewed every person ever detained by Guevara. See *Patterson*, 192 Ill. 2d at 109 (noting that, "beyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information"). This is an unreasonable obligation, particularly in light of the lower, "gist of a constitutional claim" burden that is borne by a defendant at the first stage of a postconviction proceeding. Defendants' allegations against Guevara in the case at bar are sufficiently "newly discovered" to meet the requirements of *Patterson* as applied to a first-stage proceeding.

The trial court also rejected the argument that the new evidence against Guevara was material. In its order dismissing Solache's petition, the court concluded that the allegations of physical abuse were "too attenuated and remote to be relevant." With regard to allegations such as those by Melvin Warren, who was allegedly beaten by Guevara following a traffic incident, the court stated that, while Warren's allegations referred to physical abuse during an arrest, there was no claim "that the abuse was used to obtain statements." The court took a similar view of the allegations that Guevara had improperly influenced witnesses to identify suspects. According to the court, such allegations were not relevant "as to whether Guevara physically abused Solache to get him to confess." We disagree. With regard to the remoteness of the physical abuse allegations, we note that this is not a case where there were a number of such allegations in 1983, and none since then. Instead, these allegations ranged from 1983 to 1993 (and to 1998, if the allegations of defendants, Adriana and Rosauro are included). "Even incidents that are remote in time can become relevant *** if the party presenting

the evidence can present evidence of other incidents that occurred in the interim." *Patterson*, 192 Ill. 2d at 140. The trial court also challenged the relevance of physical abuse allegations that did not claim the abuse was employed to obtain statements. In our view, this is a fairly technical distinction that does not appear useful in determining whether the allegations in question are relevant to establishing a pattern and practice of physical abuse. Moreover, it is a distinction that is inappropriate at the first stage of a postconviction proceeding, where the court is not to consider the petition on the merits but, rather, is to determine merely "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *Smith*, 326 Ill. App. 3d at 839. We make a similar observation regarding the trial court's assertion that allegations of Guevara's improperly influencing witnesses' identifications of suspects are not relevant to whether defendants' confessions in the case at bar were physically coerced. In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced. This point was made by Reyes' counsel when he explained to the trial court the relevance of Maria Rivera's testimony. During a pretrial hearing on defendants' motions to suppress, Rivera testified that Guevara "forced" her to identify an individual as the shooter in a murder investigation, even though Rivera had not seen the person who did the shooting. The trial court asked Reyes' counsel to explain "the relevance of any of this."

"MR. VERDUN [Reyes' counsel]: Judge, it's our contention that *** Detective Guevara has used coercion in obtaining the statements from – not only from Mr. Reyes but *** also [from] Mr. Solache. Judge, we think that this evidence is relevant because, in fact,

he has used *** that same technique in the past[,] this time with a witness but in fact in
another homicide case."

Moreover, the trial court's assertion that allegations of improper influencing of witnesses are not relevant is inappropriate for the same reason that the trial court's challenging of the relevance of physical abuse allegations such as that of Melvin Warren was inappropriate. At the first stage of a postconviction proceeding, a petitioner need only present the gist of a constitutional claim. In keeping with this low threshold, the trial court at this stage is not to consider the petition on the merits, but rather is to determine "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act." (Emphasis in original.) *Smith*, 326 Ill. App. 3d at 839. In this instance, for purposes of a *Patterson* analysis at the first stage of a postconviction proceeding, defendants' new allegations against Guevara are sufficiently relevant to be deemed material to their claim of a pattern and practice of abuse.

The trial court rejected, in addition, the argument that the new allegations against Guevara were of such conclusive character that they probably would change the result on retrial. In its order dismissing Solache's petition, the trial court stated: "As this court has earlier found, regardless of what other defendants may have claimed, <u>there is no evidence that petitioner was beaten in this case.</u>" (Emphasis in original.) The court added : "Upon[] medical examination, petitioner neither exhibited nor reported any signs of physical abuse." (Similar findings were made regarding Reyes when the trial court ruled on defendants' pretrial motions to suppress and on their posttrial motions.) The trial court stated, in addition: "While petitioner correctly notes that systematic patterns of torture have

31

been held admissible in other cases [citations], this fact does not free him from the burden of establishing that the allegations constitute newly discovered evidence of abuse in his case." In sum, the court stated: "This court does not believe that a reasonable probability exists that had the court been aware of these twenty three (23) allegations that the result of the hearing on the motion to suppress Solache's statements would have been different." We disagree with the trial court. With regard to the court's assertions that neither defendant showed visible signs of physical abuse, we conclude that, while this is a relevant consideration, it is not dispositive. See *Patterson*, 192 Ill. 2d at 116 ("Although we believe that [the defendants' failure to demonstrate that he suffered physical injuries] is a relevant consideration, we do not believe that the absence of physical injury, standing alone, precludes evidence of prior acts of brutality from being admissible"). We therefore reject the trial court's implication that this lack of visible evidence of physical abuse necessarily lessened the conclusiveness of the new allegations against Guevara. The trial court also erred in concluding that there was no reasonable probability that the new allegations would have altered the trial court's ruling denying defendants' motions to suppress their confessions. This sort of dispositive conclusion runs directly counter to the admonition that, at the first stage of postconviction proceedings, the trial court is not to address substantive questions relating to the issues raised in the petition. *Smith*, 326 Ill. App. 3d at 839-40. Instead, the question at the first stage is simply whether the petitioner has *alleged* a constitutional infirmity which would necessitate relief under the Act. In the case at bar, we conclude that the new allegations against Guevara are sufficiently conclusive to satisfy the *Patterson* test as applied to a first-stage proceeding.

Notwithstanding the foregoing, the State argues that the trial court did not exceed the bounds of first-stage review in its consideration of defendants' petitions. The State notes that, "in determining whether a meritorious constitutional claim has been presented, the court may examine the court file and transcripts of the proceedings in which [the petitioner] was convicted and any action taken by an appellate court." The State adds that a postconviction petition may be summarily dismissed "if the allegations contained therein are contradicted by the record." Accordingly, the State further notes that, in order to determine whether the gist of a constitutional claim has been presented, the trial court must necessarily inquire into the relevance and merits of the petitioner's supporting documents. According to the State, this is what the trial court did in the case at bar. In the State's view, the court correctly found that defendants' "new evidence" claims "were contradicted by the record and [were] not substantially new evidence," and defendants' petitions therefore were barred from moving to the second stage of the proceedings.

In making this argument, the State relies on *People v. Deloney*, 341 Ill. App. 3d 621 (2003). In *Deloney*, the defendant argued, on appeal from his murder conviction, that his custodial statement was coerced. The appellate court affirmed his conviction. The defendant filed a postconviction petition in which he asserted multiple grounds for relief, including police brutality and coercion. Because this issue had been decided on direct appeal, it was barred by *res judicata*. However, the defendant apparently included in his petition "new evidence" that allegedly revealed a pattern of abuse by the police. The trial court, in dismissing the petition as frivolous, applied the *Patterson* test and found the defendant's evidence insufficient. *Deloney*, 341 Ill. App. 3d at 627. On appeal from this

33

dismissal, the defendant argued, among other things, that the trial court, in applying the *Patterson* test, "exceeded its scope of review in the first stage by assessing the merits of the evidence and \*\*\* applied 'an outcome determinative test' rather than merely determining whether the petition stated the 'gist of a constitutional claim.'" *Deloney*, 341 Ill. App. 3d at 627. The appellate court in *Deloney* disagreed, noting that, in order to survive summary dismissal, the defendant was required to present " 'the gist of a claim for relief which is meritorious *when considered in view of the record of the trial court proceedings*.' " (Emphasis added.) *Deloney*, 341 Ill. App. 3d at 627, quoting *People v. Dredge*, 148 Ill. App. 3d 911, 913 (1986). The appellate court added that, in order to determine whether a gist of a constitutional claim had been presented, "the court must inquire into the relevance and merit of the defendant's supporting documents." *Deloney*, 341 Ill. App. 3d at 627. In conducting its analysis, the appellate court in *Deloney* mentioned "over 900 pages of documents" attached to the defendant's petition. *Deloney*, 341 Ill. App. 3d at 628. However, the court did not rely on these documents in making its decision. Instead, the court noted that the defendant's claim in his petition that certain named officers had abused him was directly contradicted by the defendant's own trial testimony that those same officers did not abuse him. *Deloney*, 341 Ill. App. 3d at 629. The court concluded that the defendant's abuse claim could be dismissed "because such a claim would directly contradict the record at trial." *Deloney*, 341 Ill. App. 3d at 629. The appellate court held that this claim remained barred by *res judicata*.

The State's reliance on *Deloney* is misplaced. Setting aside any concern that the trial court and the appellate court in *Deloney* might have held the defendant to a higher burden than appropriate

34

in a first-stage proceeding, we note that the appellate court's decision had nothing to do with the defendant's allegedly newly discovered evidence. Quite simply, the court in *Deloney* held that the defendant's claims of police coercion were directly contradicted by the record at trial. In the case at bar, we have found no such contradiction of defendants' claims in the record at trial.

We conclude that defendants' new evidence is sufficiently material, conclusive and newly discovered to meet the *Patterson* test as applied to a first-stage postconviction proceeding. The doctrine of *res judicata* may be relaxed with regard to defendants' claims of abuse by Guevara.

We hold that defendants have alleged the gist of a constitutional claim, and the trial court erred in summarily dismissing their petitions as frivolous and patently without merit. The cause must therefore be remanded for advancement to the second stage of postconviction proceedings. However, before directing this remand, we address a final claim brought by defendants.

Defendants ask that any remand in the case at bar be assigned to a different judge.[3] Defendants argue that the trial judge in this case has already determined that defendants were not abused by Guevara. They point to comments by the trial judge that he did not believe any of the testimony that defendants were abused by the police. Defendants assert: "Given the trial court's stated unwavering certainty that Detective Guevara neither abused [defendants] nor fabricated any aspect of the so-called 'confession[s],' there can be little hope of persuading the court, even with the substantial evidence that post-conviction counsel has gathered thus far, that Detective Guevara acted with egregious dishonesty and brutality in handling [these] defendant[s]." Defendants also criticize

---

[3]The argument in favor of reassignment was made by Solache in his brief to this court. In Reyes' brief, Reyes adopted this issue "as raised by Gabriel Solache in his brief."

what they describe as the judge's "willingness to improperly reach the merits of Solache's claims at the first stage of post-conviction review." According to defendants, this demonstrates that the trial judge has "already prejudged the issues." Defendants contend that the trial judge is prejudiced against their claims and, for this reason, any remand in the case at bar should be assigned to a different judge.

The State disagrees. According to the State, the trial judge "did not prejudge the merits of [defendants'] claims when dismissing [their] petition[s] but merely reviewed [the] petition[s] and determined that [they were] without merit and not worthy to proceed to the second stage." The State argues, in addition, that it would be "harmful to this case" to assign the remand to a different judge. They note the current trial judge's familiarity with "every aspect of this case," and contend that it would be difficult for another judge to step in and decide issues that, in the State's view, are "very fact[-] and legally specific to what has already occurred."

"There is no absolute right to a substitution of judge at a postconviction proceeding. [Citations.] Rather, the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced. [Citations.]" *People v. Hall*, 157 Ill. 2d 324, 331 (1993). In order to obtain a remand to a new judge, a defendant must show "something more" than simply that the judge presided over the defendant's earlier trial. *People v. Vance*, 76 Ill. 2d 171, 181 (1979). A defendant can show "something more" by demonstrating "animosity, hostility, ill will, or distrust" (*Vance*, 76 Ill. 2d at 181), or "prejudice, predilections or arbitrariness" (*People v. McAndrew*, 96 Ill. App. 2d 441, 452

36

Nos. 1-04-1047 & 1-04-1150 Cons.

(1968)). "To conclude that a judge is disqualified because of prejudice is not *** a decision to be lightly made." *Vance*, 76 Ill. 2d at 179.

In the case at bar, we agree with defendants that the trial judge appears to have improperly prejudged a central issue in defendants' postconviction case: whether defendants' newly discovered evidence against Guevara is sufficient to warrant postconviction relief. In ruling on Solache's postconviction petition, the trial judge found, among other things, that the new allegations against Guevara were "not so conclusive as to change the result on retrial." The court explained: "This court does not believe that a reasonable probability exists that had the court been aware of these twenty three (23) allegations that the result of the hearing on the motion to suppress would have been different." While this sort of conclusion is invited by one of the three parts of the *Patterson* test, we emphasize, as previously indicated, that *Patterson* itself dealt with a second-stage postconviction proceeding, where the trial court is to determine whether the petitioner has made a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. In the case at bar, which deals with a first-stage proceeding, the petitioner's burden is lower: the petitioner must merely present the gist of a constitutional claim. *Edwards*, 197 Ill. 2d at 244. In our view, the trial court's finding in the case at bar that the new allegations against Guevara "are not so conclusive as to change the result on retrial" essentially decided this issue, and, in effect, the entire case. This sort of conclusion is more appropriate to a second-stage proceeding, or, possibly, a proceeding at the third stage, where an evidentiary hearing is held. It is not appropriate to a first-stage proceeding, where "[s]ubstantive

37

questions relating to the issues raised in the petition are not to be addressed." *Smith*, 326 Ill. App. 3d at 839-40.

The issue here is not whether defendants are guilty. Rather, it is simply whether defendants have, by virtue of their new evidence, presented the gist of a constitutional claim that their confessions were coerced. In this instance, the trial court gave the impression of being unwilling to consider whether defendants had met this burden.

We conclude that defendants would be "substantially prejudiced" (*Hall*, 157 Ill. 2d at 331) if this case were remanded to the same trial judge. Accordingly, we remand the cause to the presiding judge of the criminal court, with the direction that the case be assigned to a different trial judge. Because of our decision, we need not address the remaining arguments raised by defendants in these appeals. *Dredge*, 148 Ill. App. 3d at 914.

### CONCLUSION

We reverse the trial court's judgment summarily dismissing defendants' postconviction petitions. The cause is remanded to the presiding judge of the criminal court, with directions that it be assigned to a different trial judge.

Reversed and remanded with directions.

McBRIDE, P.J. and GARCIA, J., concur.