# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Almodovar, 2013 IL App (1st) 101476**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERTO ALMODOVAR, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-1476 |
| Filed | January 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The first-stage dismissal of defendant's successive postconviction petition was reversed on the ground that the cause-and-prejudice test was satisfied by his allegations that the detective involved in his case influenced the identification of defendant through improper procedures, and the cause was remanded for second-stage proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 94-CR-24318(01); the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal     Michael J. Pelletier, Alan D. Goldberg, and Sean Collins-Stapleton, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

Panel     JUSTICE TAYLOR delivered the judgment of the court, with opinion.

Presiding Justice McBride and Justice Howse concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant Roberto Almodovar appeals from a judgment denying his motion to file a successive postconviction petition.

¶ 2     Defendant was charged with involvement in a 1994 drive-by shooting, due in part to the investigative efforts of Detective Reynaldo Guevara. Following trial, defendant was found guilty of first degree murder, attempted murder, and aggravated battery with a firearm, and he was sentenced to a term of natural life in prison. In 1998, defendant filed his first petition for postconviction relief, contending that the prosecution had failed to produce material evidence that would have exculpated him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, defendant alleged that the prosecution failed to disclose that key prosecution witnesses Jackueline Grande and Kennelly Saez, who identified defendant in a lineup and at trial, had been shown a photograph of the defendant by Detective Guevara shortly before they viewed the lineup. After a hearing, the circuit court denied the petition.

¶ 3     In 2010, defendant filed a *pro se* motion for leave to file a successive postconviction petition. This motion is the subject of the instant appeal. In this motion, defendant alleged that newly discovered evidence supported his *Brady* claim, namely, evidence that Detective Guevara was involved in a pattern of flagrant misconduct whereby he manipulated witnesses to falsely identify individuals in multiple other cases. The circuit court denied defendant's motion, and defendant now appeals. For the reasons that follow, we reverse and remand.

¶ 4     I. BACKGROUND

¶ 5     It is undisputed that in the early morning hours of September 1, 1994, Amy Merkes, Jorge Rodriguez, Jackueline (Jackie) Grande, and Kennelly Saez were the victims of a drive-by shooting on Chicago's west side. Amy and Jorge were fatally shot, and Jackie was shot in the back but survived.

¶ 6     Defendant and his codefendant William Negron were charged with the first degree

murders of Amy and Jorge, the attempted first degree murders of Jackie and Kennelly, and the aggravated battery with a firearm of Jackie. The State's theory of the case was that the shooting was motivated by street gang warfare. According to the State, both of the defendants were members of the gang known as the Insane Dragons (Dragons), which was then at war with the gang known as the Maniac Latin Disciples (Disciples). The shooting took place in Disciple territory, and two of the victims, Jorge and Kennelly, were members of the Disciples. Defendant, meanwhile, raised an alibi defense, alleging that on the night of the shooting, he was at home with his aunt and his girlfriend. He also denied being a Dragon at the time of the shooting.

¶ 7    The defendants were given a joint trial. Because defendant's claims in this appeal concern the validity of the evidence supporting his conviction, the salient facts presented at trial shall be discussed below. The State had no physical evidence directly linking the defendants to the crime; accordingly, its case centered primarily around the testimony of the two surviving victims, Kennelly and Jackie, and their identification of the defendants.

¶ 8    Kennelly testified that he had been a member of the Disciples for approximately a year and a half prior to the shooting. He stated that, at the time of the shooting, the Disciples and the Dragons were at war over territory–specifically, the street upon which Kennelly lived. He described the corner where he lived as a neutral corner, but one which mostly Disciples passed through.

¶ 9    Kennelly testified that at approximately 12:30 a.m. on September 1, 1994, he and his friends Amy, Jorge, and Jackie were sitting on his front doorstep and talking. He stated that the area around the doorstep was "very open," with lights in front of the doorway and not many trees. Near 1 a.m., he saw a blue Oldsmobile speed by. It went into an alley, then reversed back toward them and came to a stop in front of Kennelly's porch.

¶ 10    Kennelly stated that he walked toward the car, stopping five or six feet away. At that time, he said, he could see the driver and the rear passenger on the driver's side, whom Kennelly identified in court as Negron and the defendant, respectively. Kennelly said that he had not previously met either of them at the time of the shooting.

¶ 11    According to Kennelly, the defendant said, "What's up, folks." Kennelly explained that this is a typical greeting used by members of gangs that are part of an alliance known as the "folks." Kennelly did not respond in kind, because he was frightened that defendant was not actually a member of the folks. Instead, he said, "Who's that?" As soon as he spoke, the defendant pulled out a gun and pointed it at him. Kennelly took cover behind another parked car on the street. He heard eight or nine gunshots, and then he heard the car skidding away. He got up and ran inside, whereupon he found that Amy, Jorge, and Jackie had all been shot.

¶ 12    Subsequently, on September 12, 1994, Kennelly testified that the police called him and Jackie to see a lineup of suspects. The lineup was conducted by Detective Guevara. Kennelly testified that Detective Guevara did not at any time tell him who to pick, and he and Jackie viewed the lineup separately. In that lineup, Kennelly identified both the defendant and Negron.

¶ 13    Counsel for the State then elicited testimony from Kennelly about a recantation of his identification that he made in March 1995. Kennelly stated that his gang leader Ki Ki ordered

him to go to the office of Melinda Power, who at the time was counsel for the defense, and tell her that he could not identify the assailants. Kennelly did as he was told. He testified that the statement he gave to Power on that day was a lie. He said that if he had refused to follow orders, the gang would have given him a "violation," which is where a "group of guys beat you up for like three or four minutes head to toe." On cross-examination, Kennelly admitted that when he gave his statement to Power, he averred that he was not being pressured or forced into making that statement.

¶ 14 Kennelly further stated on cross-examination that he was currently in jail for violation of his probation for an unrelated robbery. A week before trial, while he was in jail, an assistant State's Attorney came to speak to him, and that is when Kennelly first professed that his March 1995 recantation had been a lie. Kennelly admitted that, prior to that conversation, he had never made any indication that he had been threatened or intimidated into making his March 1995 recantation. On redirect examination, he testified that the assistant State's Attorney did not make any promises to him regarding the disposition of his own case in exchange for his testimony.

¶ 15 Jackie provided the State's second eyewitness account of the shooting. She testified that on the night of the shooting, she, Amy, Jorge, and Kennelly were sitting together by the main entrance door to the apartment building at 3920 West Cortland. While they were sitting there, Jackie observed a navy blue car passing by and turning into an alley. It stopped at the entrance of the alley, reversed back toward them, and stopped. Jackie testified that the car stopped for "enough time for me to look at them and recognize their faces." She identified the driver as Negron and the rear passenger on the driver's side as the defendant.

¶ 16 Jackie testified that one of the defendants (she was not sure which one) said, "What's up, folks." She saw Kennelly take a few steps toward the car and ask, "Who's that?" She then saw the defendant pull out a gun and start shooting at them. Kennelly fell to the ground. Jorge opened the door to the apartment building, and Jorge, Amy, and Jackie all ran inside.

¶ 17 According to Jackie, as the three of them were running up the stairway, Amy tripped. Jackie and Jorge helped Amy to her feet. Jackie attempted to continue up the stairs, but she was shot in the back. She began screaming and heard Amy screaming as well. Jorge, who was farther up the stairway, turned back and pushed Jackie to the ground, at which time he was also shot. Eventually Kennelly entered the building and helped Jackie up the stairs. She was later taken to the hospital for treatment of her injuries.

¶ 18 Jackie testified that after her release from the hospital, on September 5, 1994, Detective Guevara came to her house and showed her a photo lineup consisting of 12 photographs. She stated that she identified a photograph of the defendant as the rear passenger who had started shooting at her, and she identified a photograph of Negron as the driver of the car. She did not recognize any of the other individuals in the photos. A week later, on September 12, 1994, Detective Guevara called her to come to the police station to view an in-person lineup. Kennelly came as well, but the two of them viewed the lineup separately. Jackie testified that there were seven people in the lineup, and she identified the defendant and Negron as the men who had shot at her. As with the photo lineup, Jackie testified that she did not recognize any of the other individuals in the in-person lineup.

¶ 19    The State also called Officer Robert Lohman, the first officer to arrive at the scene after the shooting. Officer Lohman testified that on September 1, 1994, at about 12:45 a.m., he was on patrol when a citizen named Juan Velez approached and told him that there had been a drive-by shooting at the corner of Harding and Cortland. He proceeded to the scene. He testified that although it was night, there was a streetlight and a light above the entrance to the apartment building, so he did not have any difficulty seeing what was going on. Inside the building, he found Amy lying dead on the landing, as well as Jorge and Jackie, who had both been shot but were both still alive at that time.

¶ 20    On cross-examination, Officer Lohman stated that after speaking with Velez, Kennelly, and Jackie, his only description of the offenders was that they were male Latinos, 16 to 20 years old, wearing Starter jackets. He had no information as to their hairstyle, complexion, or height.

¶ 21    The State also called Detective Guevara to the stand. Detective Guevara testified that he was involved in the investigation of the murders of Amy and Jorge. After speaking with Officers Olszewski and Siwa about his investigation and the circumstances of the crime, he obtained three photographs of Dragons, one of which was a photograph of defendant. He then spoke with gang crimes specialist Wyora and obtained a photograph of Negron. Using those photographs, Detective Guevara stated that he assembled a photo array consisting of six long-haired individuals, including the defendant, and six short-haired individuals, including Negron. To the best of his knowledge, the other individuals in the photo array were all gang affiliated.

¶ 22    Detective Guevara testified that on September 5, 1994, he went to Jackie's home to show her the photo array. He stated that he spread the photographs on her living room table, with the photographs of long-haired individuals on one side and the photographs of short-haired individuals on the other, and asked her if she recognized anybody from the night of the shooting. He testified that Jackie identified Negron as the driver and defendant as the back-seat passenger.

¶ 23    Detective Guevara stated that on September 11, 1994, he apprehended the defendant at a street corner frequented by Dragons. According to Detective Guevara, when he was performing the booking procedure, defendant identified himself as a Dragon. Early the next morning, Negron was also apprehended. That evening, Detective Guevara conducted an in-person lineup consisting of both suspects plus four or five other individuals. The individuals in the lineup were seated in a room with a one-way mirror, and Kennelly and Jackie were brought into the adjacent room one at a time. Detective Guevara testified that Kennelly identified the defendants with no hesitation, and likewise, Jackie also identified the defendants.

¶ 24    On cross-examination, counsel for the defendants questioned Detective Guevara about the investigative procedure that led him to apprehend the defendants. Detective Guevara stated that he worked the third watch, which was from 3 p.m. to 11:30 p.m. When he arrived at work at 3 p.m. on September 1, 1994, he was assigned to the case. By that time, detectives on earlier watches had prepared reports about the case, as is typical; Detective Guevara read those reports to familiarize himself with the case. He testified that he then went to the crime

scene and interviewed Kennelly, who told him that the shooter had long hair and a rectangular face. It was based upon this description that he obtained a photograph of the defendant on September 4, 1994.

¶ 25    However, Detective Guevara admitted that he did not take any notes regarding his alleged interview with Kennelly. Nor did he file any report at that time for the next watch of detectives to read. Indeed, the first and only report he filed in the case was on September 13, 1994, after both defendants had been apprehended. He also admitted that his report stated that he obtained the description of a suspect with long hair and a rectangular face from Jackie, not from Kennelly.

¶ 26    On further cross-examination, Detective Guevara testified initially that he did not speak with Jackie prior to visiting her house on September 5, 1994. However, he later testified that he called her earlier on that day, before visiting her, and she described the offender as having long hair and a rectangular head.

¶ 27    At the conclusion of Detective Guevara's testimony, the State rested. Defendant then called three witnesses to establish his alibi defense: his aunt, Mary Rodriguez, his girlfriend, Azalia "Sassy" Carrillo, and himself.

¶ 28    Mary testified that at the time of the shooting, she lived together with her husband and her son; her mother and her mother's boyfriend; the defendant, his girlfriend Sassy, and their baby; and her brother. Mary stated that her son was supposed to start school on August 27, 1994, but it was not until August 31 that she obtained money for his tuition. She took August 31 off work so that she could pay the tuition, buy his uniform, and buy school supplies to get him ready to start school the next day.

¶ 29    Mary stated that she arrived home on August 31, 1994, at around 4 p.m. She was sitting in the living room when the defendant came home from school at around 10:45 p.m. He asked her where Sassy was, then sat down with her. At around 11:15 p.m., Mary testified, Sassy came home. The defendant and Sassy went to their bedroom, where Mary could hear them arguing loudly. Mary testified that she told them to be quiet, because she had to work the next day and her son had to go school the next day. They continued arguing. Mary's mother then spoke with them, after which they "tapered down" and came out into the living room. Mary testified that while they were in the living room, Sassy's sister, Amaris, and her sister's husband, Sergio, came to the house and spoke with them. Amaris and Sergio left the house for a while but then returned to the living room and continued talking. Finally, at around 1:30 a.m., Mary stated that she told Amaris and Sergio to leave and then went to bed. Mary testified that at no time did she see the defendant leave the house after he arrived at 10:45 p.m.

¶ 30    Sassy, the defendant's girlfriend, largely corroborated Mary's testimony. She stated that on August 31, 1994, she arrived home at around 11 p.m. She had a conversation with the defendant in their bedroom that turned into "a big fight." Later that night, Amaris and Sergio came to visit. Sassy said that Amaris and Sergio stayed until 1:30 a.m., at which time they went to bed. She testified that at no time during that evening did the defendant leave the house.

¶ 31    Defendant then took the stand on his own behalf. He stated that in August 1994, he was

working at Farley's Candy Company from 6 a.m. to 6 p.m. and also attending GED classes at Wright Junior College on Monday and Wednesday nights. On August 31, 1994, which was a Wednesday, he left work early at 5 p.m. to go to class. After class, he took the bus home, arriving at around 10:45 p.m.

¶ 32　　Defendant stated that when he got home, he went to the bedroom to see if Sassy was there. She wasn't. He then went to the front room and waited for her to return. When she arrived at about 11 p.m., he asked her where she had been. The two of them then went to their bedroom and got into an argument. His aunt came in a couple times, and then his grandmother came in, but he and Sassy continued arguing. At some point, Amaris and Sergio arrived at the house and spoke with the defendant and Sassy. They stayed at the house until 1:30 a.m. Defendant testified that he did not leave the house at any time that evening.

¶ 33　　Finally, defendant stated that although he joined the Dragons when he was 18 years old, he was only a member for around a year, and he quit in March 1994. He further testified that he did not go to 3920 West Cortland in the early morning hours of September 1, 1994, and shoot two people. "I worked 12 hours a day," he said. "I go to night school. I have no time to go anywhere."

¶ 34　　On cross-examination, counsel for the State asked defendant about certain statements he allegedly made to Detective Guevara on the day of his arrest. Defendant said that he did not tell Detective Guevara that he was a Dragon but, rather, told him that he was an ex-Dragon. Defendant also denied stating that he had met with his fellow gang members that day to learn about a truce between the Dragons and Disciples. According to defendant, while he was in front of his grandfather's house that day, he saw Negron, and Negron started talking about the truce without being asked. Defendant later passed that information on to Detective Guevara.

¶ 35　　Defendant admitted that when he spoke with Detective Guevara on the day of his arrest, he did not tell him about the argument he allegedly had with his girlfriend on the night of the shootings. "At the time, I was shocked," he explained. "I was surprised. I didn't know what. I couldn't remember nothing." On redirect examination, defendant testified that he did tell Detective Guevara that, on the night of August 31, 1994, he left work early to attend a GED class from 6 to 10 p.m., took the bus home, and spent the evening with his girlfriend. He also said he told Detective Guevara that he had no knowledge of a double murder.

¶ 36　　The parties then stipulated that, if called to testify, Detective Dombrowski would state that as part of the investigation in this case, he interviewed Jackie in order to obtain a description that would aid in the identification of possible offenders. In that interview, Jackie never told him that the rear passenger shooter had a long, thin face or long hair.

¶ 37　　After the close of testimony, the jury found both defendants guilty on all counts. Defendant was sentenced to a term of natural life in prison. We affirmed his conviction on direct appeal in *People v. Almodovar*, No. 1-96-1017 (1997) (unpublished order under Supreme Court Rule 23).

¶ 38　　Defendant filed his first petition for postconviction relief on June 3, 1998, and, through counsel, he filed an amended petition on August 21, 1998. This petition is material to the instant appeal, insofar as the State argues that the successive postconviction petition at issue

in this case is nothing more than a rehash of the first postconviction petition. Accordingly, we shall consider its contents in some detail.

¶ 39    Defendant alleged that, on the day of the in-person lineup, Jackie and a Latino officer, presumably Detective Guevara, came to Kennelly's house. While outside Kennelly's house, the officer allegedly showed Kennelly photographs of the defendant and Negron and repeatedly asked him, "Are these the guys?" thus influencing his and Jackie's subsequent lineup identification. Defendant further alleged that Kennelly testified against him at trial because the prosecutor implied that he would get Kennelly out of jail in exchange for his testimony. In support of these allegations, defendant presented a sworn statement by Kennelly.

¶ 40    Defendant also presented the affidavit of Powers, former counsel for the defendant whose representation of him ended prior to trial. In her affidavit, Powers stated that she interviewed Jackie on April 6, 1995. Jackie allegedly said that she had been visited in the hospital by a police officer or officers who showed her photographs of persons and told her, "These are the guys who did it." Powers further stated that she subpoenaed Jackie's hospital records, which showed that Jackie was suspected of suffering from post-traumatic stress disorder. Powers stated that she believed this condition would undercut Jackie's ability to identify her assailants and increase her susceptibility to suggestion at the time of her identification.

¶ 41    This matter went to an evidentiary hearing on February 8, 1999, before Judge James Linn. In support of his petition, the defendant called Kennelly and Jack Callahan, a former assistant State's Attorney who had been the lead attorney at the defendant's trial. Powers did not testify at the hearing.

¶ 42    Kennelly testified that around 10 days after the shooting, Jackie came to his house and said that a detective wanted to talk to him about the case. Kennelly went outside to speak with the detective. He could not recall the detective's name but believed that he was Latino. The detective told him that suspects had been arrested for the shooting. "I got the impression that Jackie had viewed the guys and pointed them out," Kennelly said. According to Kennelly, the detective then showed him two Polaroid photographs. Kennelly testified:

> "[The detective] said that he believed that these people–these were the guys that did the shooting and that if I was willing to come down to a lineup to point them out. *** When I had the picture in my hand, and I was looking and then he was saying that these were the guys and all this stuff, and I looked at Jackie and she like nodded and she said, 'Yes, that's them.' And so I went along with it."

Kennelly stated that before the detective and Jackie told him that the photographed individuals were the perpetrators, he would not have been able to identify them, because the events of that night happened too quickly. He testified that he decided to trust the detective and Jackie's judgment because he wanted the perpetrators to pay.

¶ 43    Kennelly stated that the detective then drove him and Jackie to the police station to view the lineup. During the car ride, Kennelly said that the detective told him not to mention that he showed him pictures beforehand. At the station, while viewing the lineup, Kennelly recognized the two people who had been in the photographs and pointed them out.

¶ 44    Kennelly then spoke about the circumstances surrounding his testimony at the

defendant's trial. At the time, Kennelly was incarcerated for violation of probation. Kennelly stated that on the day of the trial, he was brought to speak with a prosecutor. Kennelly told the prosecutor that he was afraid to testify against the defendants "because I am in jail and these guys are in jail." According to Kennelly, the prosecutor told him, "Well, I will see what I can do for you." Although he did not directly promise to get Kennelly out of jail, Kennelly said that his statement made him feel better "because I figured that he has the power to do something like that." Thus, Kennelly went and testified against the defendants. He was released from jail the next day.

¶ 45 Kennelly finally stated that his present recantation of his trial testimony had nothing to do with gang truces. He testified that he was no longer a member of the Disciples, having left the gang approximately a week after the shooting. On cross-examination, counsel for the State asked Kennelly if it was still his testimony that he recanted his identification in March 1995 under pressure from the Disciples, even though he now claimed to have left the gang by that point in time. Kennelly responded that it was. He explained: "I am still in the neighborhood. *** They can come and get me whenever they want."

¶ 46 Defendant next called Callahan to testify. Callahan stated that he had been the lead trial attorney at defendant's trial, and he was responsible for the production of discovery to the defense. He said that he never informed the defense that Kennelly had been shown photographs of the defendants before viewing the lineup. He also never informed them that there were any implicit promises to Kennelly that he would receive anything in exchange for testifying.

¶ 47 On cross-examination, Callahan testified that approximately two weeks before trial, he met with Kennelly. Based upon Kennelly's prior recantation, Callahan expected that he was going to have to call him as a hostile witness. At the meeting, Callahan showed Kennelly his original statement implicating the defendant and then his subsequent recantation, and he asked Kennelly which statement was the truth. Kennelly told him that his original statement was true and explained that he had been intimidated into giving the recantation by a gang leader. Callahan testified that Kennelly never indicated that he was unsure of his identification or said that a police officer had told him who to pick out of a lineup. Callahan further stated that he said nothing to Kennelly that might give him the impression that Callahan would help him get a lenient sentence on his violation of probation.

¶ 48 The State called both Jackie and Detective Guevara to testify. Jackie testified that after she was released from the hospital, on September 5, 1994, a detective came to her house and showed her a photo array. She testified that the detective never told her which photos to pick. Jackie identified the defendants. The detective asked her, "Are you sure?" and she replied, "Yes, I will never forget their faces." She stated that this was the only occasion upon which she was shown photographs pertaining to the case.

¶ 49 Jackie further testified that on September 12, 1994, the detective came to her house to bring her to the police station to view a lineup. On the way there, they stopped by Kennelly's house to pick him up. Jackie stated that when they reached Kennelly's house, the detective parked by the alleyway and honked his horn, Kennelly came out, and they left. Jackie and the detective did not leave the car, and the detective did not show Jackie anything, nor did she

see the detective show Kennelly anything. Jackie finally stated that, in her presence, the detective never showed Kennelly any photographs or told him who to pick out of the lineup.

¶ 50    Detective Guevara testified that on September 5, 1994, he went to Jackie's house to show her a photo array, and she identified two persons. On September 12, 1994, he went to her house again to pick her up and bring her to the station to view a lineup. He then drove to Kennelly's house. He saw Kennelly looking out the window, so he honked his horn and asked him to come down. Detective Guevara stated that neither he nor Jackie got out of the car. He testified that he did not show any photographs to either of them on that day, nor did he tell either of them who to pick in the lineup.

¶ 51    On cross-examination, Detective Guevara stated that, at the time he was investigating the murders of Amy and Jorge, he was also investigating the murder of Carlos Olon, a member of the Dragons, who was killed around seven blocks away. He developed a theory that Amy and Jorge might have been killed in retaliation for the death of Olon. This led him to look for Dragons who might have reason to retaliate. He spoke to other gang crimes officers and was informed that three Dragons had recently been arrested in the area where the shooting occurred. One of them was the defendant. Detective Guevara suspected that those three Dragons might be involved in the shooting, particularly the defendant, since he lived in the area where the shooting occurred. Thus, Detective Guevara obtained a photograph of the defendant, as well as a photograph of Negron, who was known as someone who hung around with the defendant.

¶ 52    In closing argument, counsel for defendant argued to the court that Detective Guevara had a motive to use suggestive identification procedures against the defendant and Negron, because of his personal theory that they were the guilty parties. Counsel for defendant argued that this theory was merely a "hunch," not based on any particular evidence in the case, since the only description of the offenders at that point was that they were 16- to 20-year-old Hispanics wearing Starter jackets.

¶ 53    At the close of arguments, on March 9, 1999, Judge Linn denied the petition for postconviction relief. He stated that he found the testimony of Jackie and Detective Guevara to be "much more compelling" than the testimony of Kennelly, because of their demeanor on the witness stand and because of Kennelly's history with regard to the case. In that regard, Judge Linn noted that Kennelly first recanted his identification, then recanted his recantation at trial. "He seems to me to be something of a manipulative person who says what suits him at the time," the judge stated. Thus, he said, he found Kennelly's rendition of events to be "totally incredible." He also stated that he believed Callahan's testimony that he made no promises to Kennelly in exchange for his testimony.

¶ 54    On April 13, 2010, defendant filed a *pro se* motion for leave to file a successive postconviction petition. It is this motion that is at issue in the instant appeal. Defendant alleged that newly discovered evidence showed that Detective Guevara had employed suggestive identification procedures in numerous other cases, which lent credibility to his claim that Detective Guevara had used suggestive identification procedures in his case. Specifically, defendant stated:

        "12. It is petitioner's contentions that Detective Guevara has engaged in a pattern of

abuse to obtain false identifications of numerous defendant's [*sic*] at area–five Police Headquarters in Chicago. This pattern of suggestive identification dates back to 1989. At least three defendant's [*sic*], Salvador Ortiz, Angel Rodriguez, and Juan Johnson had their convictions overturned based on Guevara's illegal method of faulty identifications. See People v. Reyes, 369 Ill. App. 3d 1, 860 N.E.2d 488 (1st Dist. 2006)."

¶ 55 In support, defendant attached a copy of a June 23, 2009, Chicago Tribune article entitled "Record Verdict: Former Gang Member Awarded $21 Million for Wrongful Conviction." According to the article, in 1989, Juan Johnson, then a member of the Spanish Cobras gang, was arrested by Detective Guevara on charges of murdering a member of a rival gang. Johnson was convicted and served 11½ years in prison before being retried and acquitted in 2004 based on testimony that Detective Guevara framed him for the murder. At the retrial, witnesses testified that Detective Guevara intimidated them into identifying Johnson as the killer.

¶ 56 On April 28, 2010, the circuit court, per Judge Linn, denied defendant's motion to file a successive postconviction petition. The court explained its reasoning as follows:

"[Kennelly] is one of several eyewitnesses. The jury has heard this. I've already heard from this witness before. I found his story wholly lacking in credibility. The additional information about Detective Guevara on unrelated cases I find to be completely collateral. Again, I've already heard the witness. The jury has heard this witness. The jury knew about the first recantation. This is now his second recantation.

I find that there's nothing here that has not already been talked about at length at trial and in the previous evidentiary postconviction proceedings. So his *pro se* successive postconviction petition is denied."

Defendant now appeals.

¶ 57                                    II. ANALYSIS

¶ 58 The petition at issue in this appeal is governed by the Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)), which provides a remedy to a criminal defendant whose constitutional rights were substantially violated in his original trial or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). A postconviction petition brought under the Act in a non-death-penalty case is adjudicated in three stages. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At the first stage, the circuit court independently reviews the petition within 90 days of its filing and summarily dismisses the petition if it finds it to be "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2004). A petition will only be found to be frivolous or patently without merit if it fails to present the " 'gist of a constitutional claim.' " *Edwards*, 197 Ill. 2d at 244 (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)); accord *People v. Collins*, 202 Ill. 2d 59, 65 (2002). If the circuit court does not dismiss the postconviction petition at the first stage, it advances to the second stage, where counsel is appointed to represent the defendant and the State is allowed to file a responsive pleading. *Edwards*, 197 Ill. 2d at 245-46. A petition will be dismissed at this stage if it fails to make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246; see *People v. Coleman*, 183 Ill. 2d 366,

380 (1998). Finally, if such a showing is made, the petition advances to the third stage, where the circuit court will conduct an evidentiary hearing on its allegations. *Edwards*, 197 Ill. 2d at 246.

¶ 59 The Act generally contemplates the filing of only one postconviction petition. *People v. Ortiz*, 235 Ill. 2d 319, 328-29 (1990) (citing 725 ILCS 5/122-3 (West 2006) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.")). However, this statutory bar to successive postconviction petitions will be relaxed "when fundamental fairness so requires." *People v. Morgan*, 212 Ill. 2d 148, 153 (2004); see *Pitsonbarger*, 205 Ill. 2d at 458. Our supreme court has identified two situations in which fundamental fairness will allow the filing of a successive postconviction petition. First, a petitioner may satisfy the cause-and-prejudice test. *Pitsonbarger*, 205 Ill. 2d at 459. As shall be discussed more fully below, "cause" is defined as "an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings," and "prejudice" is defined as an error that "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2006); see *People v. Flores*, 153 Ill. 2d 264, 279 (1992) (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). Second, even where a petitioner has not met the cause-and-prejudice test, his successive petition may be considered where it sets forth a claim of actual innocence. *Ortiz*, 235 Ill. 2d at 330. Such claims are cognizable in a postconviction petition because it is a violation of the Illinois Constitution's guarantee of due process for an innocent person to be convicted. *People v. Washington*, 171 Ill. 2d 475, 489 (1996); *Morgan*, 212 Ill. 2d at 154. To establish actual innocence in a postconviction petition, the petitioner must present evidence that is newly discovered, is material and noncumulative, and is "of such conclusive character that it would probably change the result on retrial." *Morgan*, 212 Ill. 2d at 154; see *Washington*, 171 Ill. 2d at 489. We review the circuit court's denial of a motion to file a successive postconviction petition *de novo*. *People v. Gutierrez*, 2011 IL App (1st) 093499, ¶ 11.

¶ 60 In this appeal, defendant contends that the circuit court erred in denying his motion to file a successive postconviction petition. He argues that his newly discovered evidence of a pattern of abuse by Detective Guevara casts significant doubt upon Detective Guevara's testimony that he did not use suggestive identification procedures in this case and, correspondingly, bolsters Kennelly's testimony to the contrary. Thus, defendant contends that his successive petition both meets the cause-and-prejudice test and sets forth the gist of an actual innocence claim. The State challenges both of these assertions. At the heart of the State's challenge is its argument that defendant's newly discovered evidence of Detective Guevara's misconduct in other cases is not pertinent to the question of whether misconduct occurred in the present case. In this regard, the State points out that the only evidence that Detective Guevara committed abuse in the present case is the testimony of Kennelly, which was heard and rejected by the court in the prior postconviction hearing and which, according to the State, there is ample reason to doubt.

¶ 61                                  A. Cause and Prejudice

¶ 62 We begin by considering whether the successive postconviction petition in this case

satisfies the cause-and-prejudice test. This test is codified in section 122-1(f) of the Act as follows:

> "Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2006).

For purposes of this appeal, the State does not dispute that if Detective Guevara actually did use suggestive identification procedures as alleged by defendant, it would constitute prejudice. Instead, the State focuses solely on the element of cause. Accordingly, we shall focus on this element as well.

¶ 63    Our supreme court, following the lead of the United States Supreme Court, has stated that cause is present where "the factual or legal basis for a claim was not reasonably available to counsel" during the prior proceedings. (Internal quotation marks omitted.) *Pitsonbarger*, 205 Ill. 2d at 460; see *McCleskey*, 499 U.S. at 493-94. The State does not contend that evidence of Detective Guevara's pattern of misconduct was reasonably available to counsel at the time of defendant's prior postconviction hearing. Rather, the State claims that, notwithstanding the unavailability of such evidence at the prior postconviction hearing, the defendant had a full opportunity to present his claim of suggestive identification procedures at that hearing through the testimony of Kennelly. Defendant, on the other hand, argues that he was impeded from fully raising that claim in the prior proceeding because he was not able to properly challenge the credibility of Detective Guevara's testimony without evidence of his pattern of misconduct in other cases.

¶ 64    We agree with the defendant. In this regard, we find *People v. Reyes*, 369 Ill. App. 3d 1 (2006), to be highly analogous. Like the defendant in the instant case, the *Reyes* defendants were convicted in large part due to the investigative efforts of Detective Guevara; they alleged that Detective Guevara had procured the evidence against them through abuse; and they filed postconviction petitions in which their only new evidence to support their claims of abuse was evidence of Detective Guevara's "pattern and practice of misconduct" in other cases. *Id.* at 11.

¶ 65    The facts of *Reyes* are as follows. The defendants were charged with murder, having signed inculpatory statements while in police custody. *Id.* at 5. Prior to trial, defendants moved to suppress their statements, claiming that they only signed those statements because of physical coercion by Detective Guevara. *Id.* After a hearing, the trial court denied their motions, finding their testimony not to be credible. *Id.* at 8. At trial, defendants repeated their allegations of abuse by Detective Guevara. *Id.* at 9. Defendants were nevertheless convicted and their convictions affirmed on direct appeal. *Id.* at 10-11. Defendants then filed postconviction petitions in which they yet again sought relief on grounds that their

confessions had been obtained through physical abuse. *Id.* at 11. In support of their claims, defendants raised "new evidence" that Detective Guevara had " 'systematically used improper techniques \*\*\* to coerce false statements from suspects and civilians' " in other cases. *Id.* Defendants argued that this evidence established " 'a clear pattern and practice of misconduct and abuse by Detective Reynaldo Guevara.' " *Id.* The circuit court in *Reyes*, like the circuit court in the instant case, dismissed defendants' petitions at the first stage of postconviction hearings. *Id.* at 22. On appeal, the *Reyes* court reversed, holding that defendants had sufficiently set forth the gist of a constitutional claim. *Id.* at 24.

¶ 66        Although the postconviction petitions at issue in *Reyes* were not successive petitions and therefore did not have to meet the cause-and-prejudice standard, the issue on appeal was highly similar to the issue in the case at hand, namely, whether the evidence of Detective Guevara's malfeasance in other cases was material to defendants' claims of abuse in their particular cases. In that case, as in the present case, the State contended that such evidence was not enough to support petitions for postconviction relief where the specific claims of abuse raised in those petitions had already been raised and rejected in a prior proceeding. The issue arose in *Reyes* in the context of the State's claim of *res judicata*, since the issue of the voluntariness of defendants' confessions had already been decided on direct appeal. *Id.* at 15. Defendants argued that the doctrine of *res judicata* should be relaxed in light of the " 'substantial new evidence' " they had presented regarding Detective Guevara's pattern and practice of abuse in other cases. *Id.*; see *People v. Patterson*, 192 Ill. 2d 93, 139 (2000) (doctrine of *res judicata* can be relaxed in the interest of fundamental fairness if the defendant presents substantial new evidence that is material and not merely cumulative, is of such conclusive character that it will probably change the result on retrial, and the evidence was not discoverable through due diligence prior to the original trial). The circuit court rejected this claim, stating: " 'As this court has earlier found, regardless of what other defendants may have claimed, *there is no evidence that petitioner was beaten in this case.*' " (Emphasis in original.) *Reyes*, 369 Ill. App. 3d at 22.

¶ 67        Yet the *Reyes* court disagreed, holding that defendants' new evidence was relevant and material because it established a pattern of abuse on the part of Detective Guevara that would impeach his credibility. *Id.* at 18-19. The court stated, "If even a fraction of the allegations included in this evidence had been presented prior to trial, it appears likely that Guevara's credibility would have been damaged and defendants' confessions would have been suppressed." *Id.* at 19. Thus, the *Reyes* court concluded that, "In our view, any allegation that Guevara coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced." *Id.* at 21.

¶ 68        Similarly, in the instant case, we find that defendant's allegations that Detective Guevara influenced witnesses to provide identifications are relevant to whether witnesses in the case at bar were similarly influenced, since such allegations, if true, would damage Detective Guevara's credibility. As was the case in *Reyes*, the credibility of Detective Guevara is directly at issue with regard to the crucial question of how he procured the evidence that led to defendant's conviction. New evidence that attacks his credibility on that crucial question would be highly material, and, correspondingly, the lack of such evidence would significantly impede defendant's ability to raise his claim of abuse by Detective Guevara. See

-14-

725 ILCS 5/122-1(f) (West 2006) (petitioner shows cause by identifying objective factor that impeded his ability to raise a specific claim during initial postconviction proceedings).

¶ 69     The State responds to *Reyes* by reiterating its argument that, notwithstanding the new evidence of Detective Guevara's misconduct in other cases, the only evidence of misconduct in this case is the testimony of Kennelly, which is presumably the same as it was in defendant's first postconviction hearing. However, the same dynamic was present in *Reyes*; the only direct evidence of misconduct by Detective Guevara in that case was testimony that had already been heard and rejected by the finder of fact at trial. The new evidence merely sought to establish a pattern and practice of abuse by Detective Guevara, which, if true, would have a severe negative impact on the credibility of Detective Guevara's testimony that no such abuse occurred in defendants' case. *Reyes*, 369 Ill. App. 3d at 11. Just as such evidence was material in *Reyes*, we find that defendant's lack of access to such evidence at the time of his initial postconviction petition is a significant enough obstacle to constitute cause.

¶ 70     The State nevertheless argues that the instant case is less like *Reyes* and more like *People v. Deloney*, 341 Ill. App. 3d 621 (2003), in which the court held that defendant failed to present the gist of a meritorious constitutional claim relating to alleged coercion by police. At trial, the *Deloney* defendant moved to suppress an inculpatory statement that he had made while in custody, alleging that it had been coerced and given as a result of police abuse. *Id.* at 626. The trial court denied his motion. *Id.* Following his conviction, defendant filed a postconviction petition in which he raised the same allegations of abuse. *Id.* In support, he attached over 900 pages of documents relating to other cases involving police brutality, in an attempt to establish a general pattern of police abuse and brutality that would lend support to his claim of coercion. *Id.* at 628.

¶ 71     The *Deloney* court affirmed the dismissal of this petition for two reasons. First, in his postconviction petition, defendant claimed that he had been abused by three named police officers. *Id.* at 629. However, this allegation was directly contradicted by defendant's testimony at trial, where he specifically and explicitly stated that none of those three named officers had beaten him. *Id.* The *Deloney* court, relying on the principle that "a postconviction petition is properly dismissed where the allegations contained therein are contradicted by the record from the original trial proceedings," held that defendant's petition warranted dismissal insofar as he claimed that any of those three officers were those who abused him. *Id.* Second, there was no basis upon which to conclude that any of his allegedly newly discovered evidence regarding other acts of police brutality was relevant to his claims. *Id.*

¶ 72     The State argues that *Deloney* is analogous to the instant case, insofar as Kennelly's allegations of improper influence on the part of Detective Guevara are contradicted by his trial testimony in which he claimed that no such influence occurred. However, we find *Deloney* to be distinguishable in two ways. First, it would seem that the trial record in *Deloney* did not give any reason to doubt the defendant's testimony when he exculpated the officers at issue. See *id.* Nor is there any apparent reason that a defendant raising a claim of police brutality would choose to falsely exculpate the officers who beat him. By contrast, examination of the trial record in this case reveals multiple reasons to doubt Kennelly's trial

testimony. Not only did his testimony directly contradict the statement that he gave to defense attorney Powers several months earlier, but Kennelly only chose to recant that statement a week before trial, while in jail awaiting a hearing on his violation of probation. Thus, the trial record itself is conflicted as to the truth of Kennelly's testimony. Moreover, in *Deloney*, the defendant presented nothing that would link his evidence of police brutality to the particular officers who interrogated him. *Id.* Based on this lack of connection, the *Deloney* court correctly found that he had failed to establish its relevance. *Id.* In the present case, the newly discovered evidence presented by the defendant relates specifically to misconduct by Detective Guevara, who procured the identifications that were the basis of the State's case at trial. *Deloney* is therefore inapposite.

¶ 73    The State next cites *People v. Chew*, 160 Ill. App. 3d 1082, 1086 (1987) for the proposition that evidence which merely impeaches a witness generally does not afford a basis for granting a new trial. However, *Chew* is distinguishable. The defendant in *Chew* was convicted of armed robbery. *Id.* at 1084. The primary witness against him at trial was the complainant, who testified that he was going to visit a friend at 4112 West Taylor when defendant and his codefendants approached him with a gun and took his money. *Id.* After his conviction, defendant moved for a new trial on the basis of a newspaper article which stated that the house at 4112 West Taylor was a drug house. *Id.* at 1085. The *Chew* court found that his motion was correctly denied, stating:

"The allegedly new evidence here is collateral and not in any way material to the issue of whether the complainant was robbed at gunpoint by the defendants. Nor is there any basis upon which to conclude that evidence in regard to the Taylor Street house would have changed the outcome of the trial. Even if the evidence regarding the sale of drugs at 4112 West Taylor would tend to impeach Rockingham, evidence which merely impeaches a witness does not afford a basis for granting a new trial. [Citation.] Based on questions asked of both the complainant and Officer Jones regarding drug sales at the Taylor Street address, it also appears that defendant knew about the evidence prior to trial; thus we find no abuse of discretion in the trial court's refusal to grant the motion for a new trial." *Id.* at 1086.

It is apparent that the impeachment at issue in *Chew* was on a wholly collateral issue–the nature of the place which the complainant was visiting–which would have little, if any, impact upon the credibility of his account of the robbery itself. By contrast, the impeachment at issue in the case at hand is directly pertinent to the central issue of whether Detective Guevara improperly influenced the witness identifications that were used to convict the defendant. Moreover, the *Chew* court noted that the impeachment evidence in that case was known to the defendant prior to trial, whereas in the present case, there is no contention that the defendant could reasonably have learned of Detective Guevara's pattern of misconduct before his first postconviction hearing.

¶ 74    The State additionally argues that defendant has failed to present the gist of a constitutional claim because the only positive evidence that Detective Guevara improperly influenced the lineup identifications in this case is the testimony of Kennelly, whose credibility is highly suspect. It is true that Kennelly's testimony is far from unimpeached. The record reflects that he initially identified defendant at the lineup conducted by Detective

Guevara (whatever the circumstances of that lineup might have been), then recanted his identification of defendant to defense attorney Powers, recanted that recantation at trial under oath, and recanted yet a third time at defendant's postconviction hearing. However, Kennelly's lack of credibility actually highlights the importance of evidence casting doubt on Detective Guevara's credibility. In the absence of the latter, it would be no surprise if a finder of fact were to find Detective Guevara to be far more credible than Kennelly, as did the circuit court in ruling upon defendant's initial postconviction petition. By contrast, it is plausible that a finder of fact could view the evidence of Detective Guevara's pattern of misconduct as leveling the playing field between him and Kennelly in terms of credibility. Conversely, the lack of evidence as to that pattern of misconduct would impede defendant's ability to bring his claim that Detective Guevara improperly influenced Kennelly and Jackie's identifications of him.

¶ 75    Thus, we find that defendant's successive postconviction petition meets the cause-and-prejudice test. In particular, defendant has shown that cause exists by "identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings" (725 ILCS 5/122-1(f) (West 2006)), namely, the lack of evidence as to Detective Guevara's alleged pattern and practice of improperly influencing witness identifications of suspects that he targeted. Accordingly, the circuit court's first-stage dismissal of defendant's postconviction petition must be reversed.

¶ 76                                    B. Actual Innocence

¶ 77    Because we find that defendant has met the cause-and-prejudice test as set forth in section 122-1(f) of the Act and in *Pitsonbarger*, we need not rule upon defendant's alternate argument, namely, that the evidence set forth in his successive postconviction petition is sufficient to constitute a claim of actual innocence. However, we note that a strong argument could be made that defendant's successive petition would meet this standard as well.

¶ 78    As mentioned earlier, to establish actual innocence in a postconviction petition, the defendant must present evidence that is newly discovered, is material and noncumulative, and is "of such conclusive character that it would probably change the result on retrial." *Morgan*, 212 Ill. 2d at 154; see *Washington*, 171 Ill. 2d at 489. The allegations of Detective Guevara's pattern and practice of misconduct as presented in the instant petition are newly discovered, since, as noted, the State does not even contend that such evidence would reasonably have been available to defendant at the time of his first postconviction hearing. They are also material and noncumulative, insofar as they would negatively impact Detective Guevara's credibility for the reasons that have been discussed above.

¶ 79    As to whether defendant's newly discovered evidence is "of such conclusive character that it would probably change the result on retrial" (*Morgan*, 212 Ill. 2d at 154; see *Washington*, 171 Ill. 2d at 489), we note that the State's case against defendant is arguably quite tenuous. No physical evidence links the defendant to the shooting. Rather, at trial, the State relied upon the eyewitness identifications of Kennelly and Jackie, as obtained by Detective Guevara. As was noted by defense counsel at trial, Kennelly and Jackie had only a brief opportunity to see the perpetrators, and the shooting occurred at night, although there

-17-

was some testimony that lighting in the area was adequate. Thus, the State's evidence in that regard was not overwhelming.[1] Moreover, there was testimony at trial that cast doubt upon Detective Guevara's method of obtaining those identifications. Detective Guevara testified that he obtained a description of the defendant from Kennelly and Jackie, both of whom supposedly told him that the shooter had long hair and a rectangular head. However, this was called into question by the testimony of Officer Lohman and Detective Dombrowski. Officer Lohman, the first officer on the scene, testified that when he spoke with Kennelly and Jackie, the only description he obtained of the offenders was that they were male Latinos, 16 to 20 years old, wearing Starter jackets. Likewise, Detective Dombrowski stated that when he interviewed Jackie, she never told him that the rear passenger shooter had a long, thin face or long hair. In light of these conflicting statements, it is at least arguable that, if the jury had known about Detective Guevara's history of improperly influencing witnesses, they might have given more weight to the testimony of Officer Lohman and Detective Dombrowski than Detective Guevara, and they might have given more weight to the testimony of defendant's alibi witnesses than to the identifications that Detective Guevara procured and that were the backbone of the State's case.

¶ 80                                    III. CONCLUSION

¶ 81        Thus, for the foregoing reasons, we reverse the circuit court's first-stage dismissal of defendant's successive postconviction petition and remand for second-stage proceedings.

¶ 82        Reversed and remanded.

---

[1]We note at this juncture that the State argues that Kennelly's testimony at the postconviction hearing, as recantation testimony, is inherently unreliable (see *People v. Steidl*, 177 Ill. 2d 239, 260 (1997)); however, to the extent that is true, the same would apply to Kennelly's trial testimony, since that is a recantation as well.