**The People of the State of Illinois, Plaintiff-Appellee, v. John Clifford McAndrew, Defendant-Appellant.**

Gen. No. 67–155.

Second Judicial District.

July 29, 1968.

441

Haye and Keegan, of Rockford, for appellant.

Henry S. Dixon, State's Attorney, of Dixon, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

The defendant, John Clifford McAndrew, was charged with unauthorized possession of narcotic drugs, in violation of section 22–3 of the Criminal Code (Ill Rev Stats 1967, c 38, par 22–3). He entered a plea of guilty, was denied probation and was sentenced to a minimum of two years and a maximum of three years in a state penitentiary. He appealed.

■ ■ While courts have held that refusal to grant probation is not subject to review (People v. Hamby, 6 Ill2d 559, 563, 129 NE2d 746 (1955); People v. Denning, 372, Ill 549, 552, 25 NE2d 6 (1940)), the granting or revoking of probation is normally within the discretion of the trial court, but is subject to review to the extent of determining whether the trial court did, in fact, exercise discretion in its determination on probation or whether it abused such discretion and acted in an arbitrary manner. People v. Sims, 32 Ill2d 591, 596, 208 NE2d 569 (1965); People v. Molz, 415 Ill 183, 190, 113

NE2d 314 (1953); People v. Evrard, 65 Ill App2d 118, 128, 212 NE2d 305 (1965).

The scope of the judicial discretion vested in the trial court is set forth in section 117–1 of the Code of Criminal Procedure of 1963 (Ill Rev Stats 1967, c 38, par 117–1), which provides in part:

"(a) A person who has been found guilty of any offense except a capital offense, the sale of narcotics or rape may be admitted to probation when it appears that:

"(1) The defendant is not likely to commit another offense;

"(2) The public interest does not require that the defendant receive the penalty provided for the offense; and

"(3) The rehabilitation of the defendant does not require that he receive the penalty provided for the offense."

It was stipulated that the hearing on probation and in aggravation and mitigation be held at the same time. The court, in this respect, heard the testimony of the police officers, a commissioner of public safety, the mother of the defendant, two physicians—one being the uncle of the defendant—, and the defendant; and the court interrogated the defendant at length. The court also had the benefit of a psychiatrist's report obtained on behalf of the defendant; however, the record does not indicate that a probationary report was obtained or used at the hearing.

Briefly, the testimony indicated that the defendant was in need of psychiatric treatment which his mother and stepfather were willing and able to obtain at a recognized psychiatrical center; that he ranked high academically in high school; that presently he was a student at Antioch College and had come to Dixon with

a female companion to work at the Dixon State School; that although unmarried, he and his female companion registered at a local motel as husband and wife and subsequently continued to live together. There was also testimony that the rooms of the apartment in which they were living at the time of the arrest, were littered with marihuana leaves in various stages of drying; that there were quantities of crushed packaged marihuana stored at various places throughout the apartment; and that the stove broiler contained marihuana leaves and apparently had been used as a dryer.

The defendant testified that he was twenty years of age and had started using marihuana during his first quarter at Antioch College; that he had also used other drugs; that he and his female companion had packaged the marihuana to sell it and they had a friend who dealt in it; and that he was acquainted with others in Dixon who used or dealt in marihuana. The defendant also testified that he sought to be identified as a "hippie." The report of the psychiatrist also contained such statement. The totality of the testimony at the hearing would tend to justify the court in believing that the defendant might commit another such offense.

After completion of the testimony, the court denied probation and recited at some length its reflections and impressions on the use of marihuana, the attitudes of a certain segment of the youth of our society, the actions of this particular defendant and his possible harm to the community had he been able to peddle the marihuana he had gathered.

The defendant here contends that the statements of the court indicated that it acted in an arbitrary manner as a result of intellectual and emotional bias with reference to the denial of probation and the imposition of sentence; and that the court's actions were arbitrary under the facts and circumstances of this case.

█ It is not within our discretion to determine whether or not the trial court should have granted

probation. It is only for us to determine the narrow question of whether the trial court abused its discretion in denying probation. In considering the defendant's contention, we will examine the remarks of the court.

At the conclusion of the morning hearing on September 27, 1967, the court commented upon the fact that the defendant wanted to be identified as a hippie. The defendant then stated that during the past two weeks he had seen that the identity of just being a hippie lacked reality and that he was renouncing his identity. Thereupon the court referred to a recent statement of President Johnson which read: "We cannot tolerate behavior that destroys what generations of men and women have built here in America—no matter what stimulates that behavior," and asked the defendant what it meant. He replied: "I don't really think I can say what he meant. I think probably 'We are not going to tolerate behavior,' he is talking about everything that is happening that has to do with the younger people, these drugs, black power people, radicals. I don't know if he is talking politically or morally." The court then asked: "You don't think he was talking about hippies?" and the defendant replied: "He could have had hippie ideas in his mind."

Following the arguments by counsel, the court stated: "I have spent a lot of time thinking about this case. . . . The State's Attorney didn't have much to say here today, he left it entirely up to the Court. I guess that's right, that's my responsibility. There are a few things I might disagree with the attorney for the defendant. Principally when he gets up here and says to this Court the court should bear in mind that this young man hasn't damaged anybody but himself. I take exception to that, Mr. Merrick, I think he has damaged everybody that he has associated with. I certainly think that he damaged or was certainly in a position possibly of damaging little youngsters who were in a State mental institution placed under this man's care where

445

everybody now decides he is so sick. I think he was damaging somebody there. He has damaged a thousand students out at Sauk Valley College, he has damaged the possibility of a thousand students at Dixon High School because any one of them could have been exposed to his potential sale which he and this young lady had made very careful plans and by his own admission was about to be in the business of selling. I don't believe it was the intention whatsoever that these packets, all of which were very carefully prepared, all of which were very carefully filled, all of which were very handy, with intention of taking these packets back to Antioch College to sell them because we have got testimony here this young man became acquainted with the individual who has the distribution of this type of thing in this particular area. . . . I don't think that he needed to take it back to Antioch because, by his own testimony, 75 percent of the student body at Antioch College were marihuana users. This to me is a shameful reflection on an educational institution and an educational institution which knew that this boy was using marihuana and did absolutely nothing about it and apparently hasn't done anything about it yet. I would hate to think I had a son or daughter of mine attending a school like Antioch College and I am not going to let Sauk Valley College become an Antioch College, I will tell you that. . . .

"I trust and I hope, and when I say I, I mean this Court hopes, that this is as far as it will go in this community and in this county because we all have children living in this community, we all have children going to school in this community and there are others who have young people going to school in Sauk Valley. . . . I just want to read you a little note here that I read the other day, written by a young person, too. It was in a Chicago paper. . . .

"'They may be seen in the streets of our city, at Old Town and in deserted apartments off any

446

college campus, smoking pot, living not within reality but in a universe of crimson hallucinations and having many anxieties that sooner or later may lead to serious brain damage.

" 'To become involved with marihuana will lead to impaired judgment and altered perceptions. Any impulsive risk you take from smoking grass is a dangerous hazard to your health.

" 'Some of the people we are talking about are known as hippies, some are innocent teen-agers who are lured into taking these drugs. Many of the hippies and teen-agers are rebelling against society. Most of them are trying to escape from the horror of wars and the problems of life, leaping into a world of beautiful flowers and different color light shades, wanting to remain there forever instead of facing reality. So they continue to consume these drugs. Each day and night they are trying to escape from the world.

" 'Teen-agers are also rebelling against rules of parents and society. They are easy prey for pushers of marihuana, who think only of how much profit they can make out of it. They give little thought to the welfare of the ones who take this drug and what it can lead to. Smoking pot becomes a habit that cannot be broken easily and will also destroy your mind. It leads to many crimes of self-destruction. The idea of grass smokers is to turn on, take off and then all your troubles are almost gone. Instead of alcohol, it's the marihuana kick today that is sweeping over America.' . . .

"Possibly some of our students in Dixon High School, because they are young teen-agers, could be easy prey, too, for a pusher of marihuana. Something to try out. Well, if it isn't there in the package form and in the processed form maybe it wouldn't be quite so easy for them to get.

447

"There's something that no one has made a remark on here at all during the course of all this hearing, except by my questioning, and it seems to be something that apparently is acceptable but it isn't acceptable to this Court, that we have reached the state in this country where we say it is perfectly alright for a young man and a young woman to go ahead and live together, not married. I wonder what we are beginning to condone in this society if we are saying it is alright to go ahead and smoke marihuana, you just get a lift, you just get a feel, you just get a hallucination, you just live on a cloud. I am beginning to wonder what's happened to the morals of this society and, you see, it is the hippies that resent society, they want to be identified. I am not at all impressed by the emphasis that's been placed in this courtroom of this young man's superb intellect. I think I would have been more impressed if somebody had taken the stand and said he is a good boy, he has been a good boy, he tells the truth, we trust him. . . . In the first place this young man has indicated he is a liar, that he misrepresented facts to people. Oh, we may be farmers out here in this community but I think we still know right from wrong and I still don't believe that we approve of everybody living together whether they are married or whether they are not. That's not much of an example for the young people in this community and yet this young man and this young lady—and incidentally this young lady is just as involved as this young man—represented to different people here that they were married. Start right out, number 1 a lie. . . .

"There's testimony here that perhaps you need some psychiatric care. Well, maybe there's a lot of people who need psychiatric care, I don't know. The Court didn't have the opportunity to confront this psychiatrist who wrote this long report so I don't know anything about the psychiatrist except that he has some qualifications, and I am sure that they are excellent qualifications.

448

There are many disturbing things in this case as far as I am concerned.

"I might point out to you, . . . I am reading from the Statute of the Laws of the State of Illinois—'before someone can be admitted to probation it must appear that the defendant is not likely to commit another offense.' There hasn't been a question asked by anybody, when this young man was on the stand or from anybody else, that would indicate to this Court whether or not this young man was likely to commit another offense. I . . . observed this young man testifying the Court is not convinced that this young man, at the present time, has any intentions of changing his type of life that he has been leading. It's going to take a long time to change his philosophy of life, because by his own admission, whether it was in a report to me or on the witness stand, he doesn't like the middle class society, none of the hippies like the middle class society, yet what is society generally composed of? Most of us are middle class. . . . I hope when you have the time that maybe you will try to understand this middle class of society which is the class of society which has made this the greatest country in the world, but unless something is done pretty soon by the Courts or by law enforcement agencies or somebody else to see that the laws are enforced and to see that the laws are carried out, we are not going to have a very strong society because it is getting weaker every day and it is the hippies and it is a few other people who have a complete disregard for laws that are tearing down the very basis of this country. . . .

"The second basis on which you must establish in order to have probation is that the public interest does not require that the defendant receive a penalty. Well, I think the public interest does require that, because I think it is time the public and everybody in it understands we do have laws and if we don't live and abide by them then this country is going to be completely

demoralized. . . . I feel it is this Court's responsibility to see that the law is upheld. . . . By doing what I am going to do today on the pretense that this young man needs psychiatric help, well I think I can find you about 1500 people in the next hour and a half that need a little psychiatric help, and he will get psychiatric help where he is going because they have plenty of psychiatrists. I have nothing here in evidence that establishes whatsoever that he is not likely to commit another offense, even by his own testimony, except he says he is starting getting off the smoking. . . .

"THE COURT: Please stand up here, young man. You have filed a petition for probation. The court is not satisfied—Alright, if you wish to say something I will be glad to hear it.

"DEFENDANT: First of all, Diane and I never had sexual intercourse.

"THE COURT: I didn't say that. I said you slept together.

"DEFENDANT: We couldn't afford to do it any other way.

"THE COURT: I don't understand you when you say to me you couldn't afford to do it any other way when your stepfather is a doctor.

"DEFENDANT: We didn't want to come to our parents.

"THE COURT: Well, that's tough. Then somebody missed some place along the road about who should see who and who to talk to.

"Stand up like a man. For once in your life be a man for your mother's sake, because up to this time you haven't established or shown too much manhood so I expect at this time for you to be a man. . . .

"You are going to get mixed up with the middle class society and some that isn't quite middle class. You

placed yourself in this position, the Court hasn't placed you in this position, nobody here, the policemen or anybody else placed you in this position, you placed yourself in this position, nobody else. . . . This might be the making of a man out of you, I hope it is, and I hope I am not wrong but I am going to deny your petition for probation. I think that all the factors involved are such that you are not going to serve the best interests of the public and I don't think you have satisfied this Court that you have any intention of changing your mind. For that reason I am denying the petition for probation. . . ."

In view of the foregoing statements, we cannot but believe that the court brought to this hearing for probation, its own prejudices and predilections as to the behavior of hippies as a class, and that the court had such a strong feeling on this subject that it could not accord to the defendant, who had sought to be identified as a hippie, the full and fair consideration of the factors which should be given careful thought in connection with the application for probation.

The court commented on the damage or harm which the acts of the defendant did to the children at the Dixon State Hospital, the students at Dixon High School and Sauk Valley College, even though there was no evidence of record pertaining to such matters. Earlier in the hearing, the court extensively examined the defendant with reference to the hippie movement, the defendant's use of LSD and its effect on the youth of America. The LSD issue was totally irrelevant in this case.

The court commented on the fact that the defendant had lied concerning his marital status. However, the defendant did not lie in court, but rather, admitted his acts, and from the time of his arrest he cooperated fully with the court and the authorities.

451

Contrary to the statements of the court, the record indicated that the defendant had, until recently, been a boy of excellent character who received a commendation as a National Merit Scholar and had been accepted for attendance at Boys State by the American Legion. Also, the record indicated that this was the first time that the defendant had ever experienced any kind of trouble with the law; and that his mother and stepfather were ready and willing to furnish him excellent psychiatric care.

There was no attempt by the court to relate the sudden change in the defendant's behavior and mannerisms to the testimony of record or the report of the psychiatrist. Also, there was no reference to the psychiatrist's prognosis and recommended treatment, which the psychiatrist stated could not be pursued on behalf of the defendant while he was in prison.

■ ■ In view of these circumstances, we do not believe that the court did, in fact, exercise discretion in its determination relative to the petitition for probation. Rather, we believe that it acted in an arbitrary manner in this respect and abused its discretion. The quality of justice which courts dispense in time of tension and stress is one of the indices of the capacity of a free society to survive. Therefore, courts must be certain that their judgments are firm but just; and that they are untainted by prejudice, predilections or arbitrariness.

■ The court imposed a sentence on the defendant of not less than two nor more than three years in a State Penitentiary. Such sentence was within the statutory limits authorized by law and was in the nature of a minimum (not maximum) sentence. (Ill Rev Stats 1967, c 38, par 24–40.) Such sentence should not be interfered with by a reviewing court unless it clearly appears that the penalty imposed constitutes a great departure from

452

the fundamental law. People v. Smith, 14 Ill2d 95, 97, 150 NE2d 815 (1958); People v. Stevens, 68 Ill App2d 265, 273, 274, 215 NE2d 147 (1966); People v. Johnson, 68 Ill App2d 275, 282, 215 NE2d 144 (1966).

Under the power vested in us by Supreme Court Rule 366(a)(5) (Ill Rev Stats 1967, c 110A, par 366(a)(5)), we affirm the judgment of guilty and for the purpose of affording the defendant a new hearing on his petition for probation, we vacate the sentence which was imposed, reverse the denial of the application for probation and remand the cause to the trial court with directions to procure a probationary report and thereupon cause the action to be assigned to another judge of the 15th Judicial Circuit for a new hearing upon the application for probation. At such hearing, the probationary report should be made a part of the Report of Proceedings at The Trial, and the judgment on the application for probation should be determined pursuant to the judicial discretion vested in the Trial Court as set forth in section 117–1 of the Code of Criminal Procedure of 1963, and free, so far as humanly possible, from any prejudices or predilections which would tend to preclude a fair consideration of the petition on its merit.

After such hearing, the assigned judge should enter such order on the application for probation as may be proper under the evidence and the probationary report, all pursuant to the judicial discretion vested in the trial court as set forth in section 117–1 of the Code of Criminal Procedure. In event probation is granted, the court may impose such conditions in connection therewith as may be proper, pursuant to the provisions of section 117–2 of the Code of Criminal Procedure. In event probation is denied, the court should impose sentence, and, as a guide to the trial judge, but without limiting his discretion in the matter in any respect, we find that the

453

sentence heretofore imposed did not constitute a great departure from the fundamental law.

Affirmed in part; reversed in part; and remanded with directions.

ABRAHAMSON, P. J. and SEIDENFELD, J., concur.