2020 IL App (2d) 180625-U
No. 2-18-0625
Order filed October 21, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-423 |
| SANTOS HERNANDEZ, | ) ) ) | Honorable Robert A. Miller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1   *Held*:   In sentencing defendant for sex crimes against his daughter's friend, the trial court properly considered in aggravation defendant's jail phone call with his wife in which he showed callous disregard for his daughter's troubling behavior in response to the crimes and for his wife's concern that the daughter would be removed from the home by child protective services; defendant's remarks displayed a lack of remorse and failure to accept responsibility for the consequences of his actions, which are proper sentencing factors.

¶ 2   Defendant, Santos Hernandez, entered open pleas of guilty to two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.20(a)(2), (a)(4) (West 2014)) alleging that, on two separate occasions between June 1, 2015, and March 2, 2017, he engaged in acts of sexual

penetration with S.R., who was under the age of 17. After a hearing, he was sentenced to consecutive eight-year prison terms. On appeal, he contends that the trial court committed plain error by considering an improper sentencing factor. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      On January 23, 2018, the parties presented the plea agreement, with the following factual basis. Defendant was born on February 14, 1985. S.R. was born on February 15, 2001. Defendant's daughter A.H. was S.R.'s close friend. Defendant once took S.R. with his family on a vacation to Indiana. He knew S.R.'s age. They had sexual intercourse numerous times, including several when S.R. was sleeping over with A.H. at his house. At other times, defendant picked up S.R. from school, had sex with her at a motel, and drove her home. They also had sex in a vehicle. Defendant told an investigator that he and S.R. had intercourse approximately 50 times. He told S.R. that he loved her and was going to leave his wife, Chantal, to marry her. S.R.'s father, R.R., learned of the relationship when she inadvertently sent him a text message intended for defendant.

¶ 5      The trial court accepted the agreement and continued the cause for sentencing. The presentencing investigation report (PSIR), filed March 8, 2018, stated that, in January 2017, S.R. told an investigator that she and defendant had had a relationship since she was 14. In March 2017, defendant told an investigator that the relationship became sexual when S.R. was 15 and ended in December 2016. He told the probation officer who compiled the PSIR that S.R. initiated the relationship by repeatedly texting him and sending explicit photographs online.

¶ 6      The PSIR stated that defendant's record included driving under the influence of alcohol in 2003 and several other traffic offenses. He owned a small lawn-care business. Defendant told the probation officer, " 'I am willing to take three to four years in prison. I didn't harm anyone. I am willing to take up to seven years. I took responsibility for my actions. I didn't kill anyone.' "

¶ 7 On July 16, 2018, the trial court held a sentencing hearing. Carmen Easton, an investigator for the Du Page County Children's Advocacy Center (Center), testified as follows. In December 2016, R.R. told her that S.R. had been missing school and was hospitalized after harming herself. He said that S.R. had become close friends with A.H., who was approximately five years younger. On December 5, 2016, R.R. received S.R.'s text message, intended for defendant, and became aware of her sexual relationship with defendant. After she admitted the relationship, it took time to get her to come to the Center, because she did not want defendant to get into trouble.

¶ 8 Easton testified that S.R. had informed A.H. of her sexual relationship with defendant. She told Easton that the sexual behavior began in July 2015, about three months after she became friends with A.H. Easton identified a letter from S.R. to defendant. It was undated but was written during the investigation. In the letter, S.R. said that what they did was wrong but that she still loved defendant and that, when she turned 18, they could be together and have a family. She added, "Everything is both of our faults." She begged him not to go back to his wife after he left prison. She denied R.R.'s claim that defendant had been manipulating her.

¶ 9 Easton testified that, on March 2, 2017, defendant came to the Center voluntarily. He admitted to approximately 50 sexual encounters with S.R., in motels, forest preserves, and his home. He never said that S.R. sent him explicit images. He considered her "mature."

¶ 10 The State played a recording of a telephone call between defendant and Chantal, made on January 31, 2018, from jail. The call lasted four minutes. We summarize it as pertinent here.

¶ 11 At the outset, Chantal was distraught and crying. She said, "DCFS [the Department of Children and Family Services] is involved right now." A.H. had been "acting up" and "doing all this stuff" on social media. Her schoolmates had told their teacher and the principal wanted to talk with Chantal. Defendant responded that the foregoing had "nothing to do with [Chantal]." He

said that A.H. was "looking for attention" and he added, "If she gets taken away, that's her fault, not your fault." He added, "Let her be put in a fucking foster home if that's what she wants." Defendant told Chantal that DCFS could do nothing to her: "Why the hell you fucking crying about it. You didn't do nothing wrong." Chantal reminded him that DCFS had become involved, and she feared that A.H. would get "taken away." Defendant answered, "She's gonna get taken away *** If that's what she wants, then fine." He added, "She's doing all this bullshit, then you know what? She's going to pay for whatever actions she's doing right now." He said, "Let them take her. That's what she wants, I guess [by acting up]." Chantal told him that A.H. missed him and that was why she was acting up. He replied, "What do you want me to do about it?" Chantal said that he could do nothing. She added, "They're recording you." Defendant replied, "I don't give a fuck."

¶ 12    The court admitted R.R.'s victim impact statement. He said that he had never imagined that S.R. would be sexually abused by defendant, whom he had trusted to protect her. R.R. had restricted S.R.'s freedom of movement, as he did not consider her safe outside the home and her parents' supervision. R.R. was scarred emotionally by defendant's deceit and abuse of trust; he had looked on A.H. "as an adopted daughter." S.R. had been forced to go to the hospital and obtain counseling because she was harming herself and was traumatized. She was improving but still had nightmares and her family worried about her emotional health. S.R. would have "scars both inside and out from what the defendant did for the rest of her life."

¶ 13    Defendant introduced letters from Chantal and A.H. Chantal wrote that she and their two daughters missed him very much. She struggled trying to run defendant's business and suffered depression and anxiety. A.H. wrote that she greatly missed defendant and all that he did for her

and their family. She was hurt that all her friends had their fathers in their lives but she did not, and she dreamed at night of his returning home.

¶ 14  Defendant introduced several documents from JUST of Du Page, a faith-based organization that conducted programs at the jail. Defendant had participated in Bible studies and worship services, G.E.D. classes, and parenting classes. The jail's chaplain wrote that defendant had made spiritual progress through counseling, had attended church services, and had taken advantage of the classes offered.

¶ 15  In its closing argument, the State emphasized that defendant exploited the trust that S.R. and her family placed in him and repeatedly violated S.R. with no consideration of the harm that he was doing her. He called S.R. "mature," but he exploited her lack of sophistication. Contrary to his representations in the PSIR, S.R. had done nothing to initiate the exploitative relationship.

¶ 16  The State argued that defendant had caused emotional harm to S.R.'s family. Moreover, although Chantal and A.H. portrayed him as a loving husband and father, he was unconcerned about the effect of his crimes on them. That was evident from the jail call. His "ranting when told about these horrible events that [were] happening with his daughter" consisted of telling his wife that A.H. needed to take responsibility for her actions, even though they resulted from "the devastation that he [had] caused." A.H. was "reeling" from the results of his offenses, yet his "cruel response [was] to let DCFS take her. Let her go. Let her end up in one of those horrible foster homes." Defendant did not object to any of the foregoing.

¶ 17  The State argued that defendant's statement in the PSIR that he harmed nobody showed his lack of insight into what had happened and suggested that he would reoffend if given the chance. The State asked the court to sentence defendant to 25 years.

¶ 18    Defendant argued that he was not trying to blame S.R. for anything. He had voluntarily spoken to Easton and had acknowledged his wrongdoing by pleading guilty. He had also worked hard in jail to take classes to improve himself.

¶ 19    Defendant argued that the jail call did not imply that he did not care for A.H. Chantal was hysterical and he was attempting to calm her down. He was "not trying to get rid of his daughter in any type of fashion whatsoever." He was not implying that he did not care about A.H. Her letter to the court showed that their relationship was strong and positive. His absence would work a severe financial hardship on Chantal and their daughters. A.H. missed him greatly. Noting that the sentences were mandatorily consecutive, defendant requested the four-year minimum for each.

¶ 20    In allocution, defendant apologized to S.R., her family, and his family. He said that A.H. did nothing wrong and that the fault lay entirely with him. He noted that his family would be deprived of his financial and emotional support.

¶ 21    The trial court stated as follows. One consideration was the likelihood that defendant would reoffend. It was disturbing that, despite the counseling and classes he had had in jail, defendant still believed that S.R. had "consented" to sex with him. Her expressions of guilt and concern carried little weight with the court, given her youth and vulnerability. The court continued:

> "I take a look at what [R.R.] said in his statement, and I compare it to the defendant's audiotape. [R.R.] writes about his daughter, and he doesn't say anything like—or suggest that his daughter was somehow to blame, that this is—his daughter asked for this and this is what she got in return. This was all about how she was a victim, maybe he should have known better, they have to get her counseling, they have to help his—he needs

to help his daughter. It's really all about putting his daughter first, and that's how it's supposed to be. A parent is supposed to take a bullet for their kids.

But then I listened to the defendant on the audiotape with his wife, and, apparently, [A.H.] is being threatened with being removed from the household. And in the end the defendant is saying well, listen, if they want to take her, let them take her; you didn't do anything wrong. This is something that she's done, so if DCFS wants to take her, let them take her. This is his own daughter. This is the kid that he should be laying down on the railroad tracks to protect, and on the audiotape, he's saying, well, let DCFS take her. Who knows where she's going to go, but that's her problem. A stark difference between [R.R.]'s caring for his daughter and the defendant caring about his daughter."

¶ 22    The court noted defendant's statement in the PSIR that he " 'didn't harm anyone.' " The court remarked that, to the contrary, the emotional scars that S.R. suffered were taking their toll already. Moreover, defendant's hope to resume his relationship with S.R. when she turned 18 showed that he believed "that of all the people in the world, the person who was just right for him as far as a spouse would be the friend of his preteen daughter who was spending the night at his house and lived down the block."

¶ 23    Turning to mitigation, the court stated that the effect of the counseling and classes in jail was unclear. Defendant did go to the Center voluntarily and cooperate with the investigator. He had brought out some factors that persuaded the court that his sentence should be less than what the State had urged. The court sentenced defendant to two consecutive eight-year prison terms.

¶ 24    Defendant moved to reconsider his sentences. His motion contended in general terms that the sentences were excessive. It did not contend that the court had considered improper factors.

¶ 25     At the hearing on the motion, defendant argued briefly that the court had given insufficient weight to the mitigating factors. He did not contend that the court had considered improper factors. The State responded that the court had weighed the factors properly. Further, defendant's claim of remorse was undercut by the jail call. Defendant did not object or argue further. The court declined to reconsider the sentences, observing that it had originally considered longer sentences, in view of the nature and frequency of defendant's sexual acts with S.R. and his statements in the PSIR that he had harmed nobody. The mitigating evidence at the hearing had persuaded the court to limit the sentences to eight years. The court did not mention the jail call. After his motion was denied, defendant timely appealed.

¶ 26                                         II. ANALYSIS

¶ 27     On appeal, defendant contends that the trial court considered an improper sentencing factor: his parenting choices, as reflected in the jail call, and their contrast to those of R.R. Defendant relies on authority forbidding a judge from basing a sentence on his or her subjective personal feelings about a defendant's lifestyle choices. He contends that, because family relationships implicate protected interests, considering this factor was unconstitutional.

¶ 28     Defendant acknowledges that he has forfeited this contention by failing to raise it in his postjudgment motion. See *People v. Enoch*, 122 Ill. 176, 186 (1988). Therefore, he invokes the plain-error rule, under which we may remedy a " 'clear or obvious error' " where the evidence is closely balanced or the error was so serious that the defendant was denied a substantial right. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). First, however, we must decide whether a clear or obvious error occurred at all. *Id.*

Moreover, when an issue is forfeited, the defendant has the burden to prove both plain error and prejudice. *Id.* at 495; *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 16.[1]

¶ 29    We turn to the merits. Whether the trial court relied on an improper sentencing factor is a question of law that we review *de novo*. *Mauricio,* 2014 IL App (2d) 121340, ¶ 15.

¶ 30    Defendant cites *People v. Smothers*, 70 Ill. App. 3d 589 (1979), where the defendant was convicted of a cannabis offense and sentenced to four months' imprisonment. The appellate court held that the trial court had improperly considered the defendant's "life style," including living with a woman who was not his wife. *Id.* at 591. Defendant also cites *People v. McAndrew*, 96 Ill. App. 2d 441 (1968), where the defendant was convicted of a drug offense and sentenced to two to three years in prison. The appellate court held that the trial court had erred in considering in aggravation, in part, "its own prejudices and predilections as to the behavior of hippies as a class" to such an extent that it had neglected "the full and fair consideration" of proper factors in aggravation. *Id.* at 451.

¶ 31    Defendant contends that these cases apply here because the trial court improperly "censured" him for his " 'tough love' parenting style during a jail call." He contends that the court

---

[1] Defendant asserts that, if the court considered an improper sentencing factor, we  may not affirm unless we can determine from the record that the weight placed on the improper factor was so insignificant that it did not lead to a greater sentence. See *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Defendant overlooks that, as we clearly noted in *Mauricio*, *Heider*'s statement applies only when the error is properly preserved; in a plain-error analysis, the defendant has the burden to prove prejudice. *Mauricio*, 2014 IL App (2d) 121340, ¶ 16.

improperly considered his "lifestyle choice," which was irrelevant to determining whether he was remorseful and accepted responsibility for his actions.[2]

¶ 32    Defendant next cites *People v. McCumber*, 132 Ill. App. 3d 339 (1985), in which the defendant was convicted of voluntary manslaughter and other offenses. The appellate court majority held that the trial court had erred in considering in aggravation that the defendant had had three abortions in three years, as "[t]he lawful exercise of one's constitutional rights is not, and must not be, a factor in aggravation or mitigation." *Id.* at 345. Defendant contends that here the trial court also infringed on his right to privacy by penalizing him for caring for his child as he saw fit.

¶ 33    Finally, defendant cites *Mauricio,* a first-degree murder case in which we held that the trial court erred by considering in aggravation the victim's admirable personal traits. We noted that the United States Supreme Court had upheld the use of victim-impact statements but not reliance on the "mere status" of the victim. Punishment must not be based on the degree to which a victim was perceived as an asset to the community. *Mauricio*. 2014 IL App (2d) 121340, ¶ 19; see *Payne v. Tennessee*, 501 U.S. 808, 823 (1991). Defendant contends that *Mauricio* forbade the trial court here from comparing R.R.'s attitude toward S.R. with defendant's attitude toward A.H.

---

[2] Defendant also argues that the jail call was not of "any consequence in determining whether [he] *** engaged in sexual conduct that harmed S.R. or violated the law." This statement is accurate but pointless. The sentencing hearing was not held to determine whether defendant had engaged in sexual conduct that harmed S.R. or whether he had violated the law, as he had already admitted these allegations by pleading guilty.

¶ 34    We see no merit in defendant's contentions in any respect. We have listened to the jail call and cannot accept defendant's strained, if not tortured, interpretation of his remarks. More important, the trial court was not obligated to construe defendant's remarks in such a light. The court did not commit any error, much less a clear or obvious one, in concluding that the attitudes and beliefs that defendant exhibited during the call shed light on his character, degree of remorse, and prospects for rehabilitation. Defendant concedes that these are proper factors. See, *e.g.*, *People v. Toliver*, 246 Ill. App. 3d 842, 851 (1993) (trial court properly considered defendant's lack of responsibility toward his children).

¶ 35    The court did not need to interpret defendant's remarks as "tough love": there was toughness evident, but not love. Defendant's reaction to the prospect of A.H. ending up in a foster home was devoid of compassion toward her or Chantal. He repeatedly said that his preteen daughter was to blame for her actions, which he knew resulted from his repeated molestation of her close friend. He said that she misbehaved solely because she wanted attention and that she wanted to end up in a foster home. Of course, in placing the blame on A.H., he continued to deny his own responsibility for the natural and predictable consequences of his acts. Ironically, defendant held his young daughter to a higher standard of personal responsibility than he was willing to accept for himself as an adult who was supposed to look out for her best interests.

¶ 36    Defendant also showed contempt for Chantal and her concern over A.H.'s troubles. His response was devoid of empathy and implied that Chantal should be concerned only about her own narrow interests. He did not try to give her hope that A.H. would not be removed from home. Instead, he said that A.H. would deserve it, and he asked contemptuously, "What do you want me to do about it?"

¶ 37    In concluding that the trial court could give defendant's remarks their natural and obvious import, we do not rely solely on the words themselves.  Having listened to the recording, we are not limited to a "cold record."   Although defendant characterizes himself and Chantal as "two understandably vexed and distraught parents," his tone of voice indicated not distress but indifference, impatience, and contempt.  If he was "vexed," it was only at Chantal's distress and her insistence that A.H.'s well-being was a serious matter for which he bore some responsibility. Both what defendant said and how he said it gave the court ample reason to find that he had not accepted responsibility for his crimes and the harm that he caused.  The court did not have to view his deficiencies of character as a mere "lifestyle choice."

¶ 38    Defendant's remarks during the call were as proper in aggravation as his remarks to the probation officer, as recorded in the PSIR, in which he also denied the harm that he had caused others.  Defendant does not contend that the court erred in considering the latter in aggravation, and he cannot maintain that the court erred in considering the former. *Smothers* and *McAndrew* are vastly different on their facts and simply have no pertinence here.

¶ 39    *Mauricio* also has no pertinence here.  The trial court used R.R.'s statement for illustrative purposes, to clarify why defendant's remarks showed irresponsibility, lack of a penitent spirit, and a deviation from social and moral norms.  Defendant cannot show that the court sentenced him to a longer term because R.R. was a normal caring parent.

¶ 40    Finally, *McCumber* has no pertinence either.  As we have explained, the jail call was highly relevant to legitimate considerations in aggravation.  Unlike the trial court in *McCumber*, the court here did not penalize the exercise of a constitutional right that had no proven bearing on the defendant's character, attitude, and potential for rehabilitation.  Defendant had the right to speak

his mind in a recorded call, but no right to be avoid the proper consequences of his choice to provide evidence that would count against him at sentencing.

¶ 41                                          III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 43    Affirmed.